# APPENDIX B

# STATEMENT OF WORK

## for

## REMEDIAL DESIGN/REMEDIAL ACTION

## MIG/DEWANE LANDFILL SUPERFUND SITE

## (Boone County, Illinois)

# Table of Contents

**SECTION**                                               **PAGE**

1.0      INTRODUCTION ........................................................................5

     1.1      Purpose .........................................................................5

     1.2      Site Description ...........................................................5

     1.3      Site History .................................................................6

2.0      DESCRIPTION OF THE REMEDIAL ACTION/PERFORMANCE
     STANDARDS ..........................................................................7

     2.1      Landfill Gas Management Program .........................8

     2.2      Institutional Controls, Access Restrictions and Deed Restrictions ..............8

     2.3      Storm Water Management/Surface Water Diversion System .......................9

     2.4      Closure of Leachate Surface Impoundment ...........9

     2.5      Leachate Collection and Management .....................9

     2.6      Groundwater Remediation and Management ..........11

     2.7      Landfill Cover/Cap .....................................................12

3.0      OPERATION & MAINTENANCE .......................................13

4.0      SCOPE OF REMEDIAL ACTION PROGRAM .................13

5.0      SCHEDULE ..........................................................................13

6.0      REMEDIAL DESIGN TASKS ..............................................13

     6.1      Task 1 - Contractor Procurement .............................14

     6.2      Task 2 - Project Planning ..........................................14
            6.2.1    Meeting Preparation ........................................14
            6.2.2    Initial Meeting ...................................................14
            6.2.3    Site Inspection ...................................................14

6.2.4    Preparation of Minutes....................................................15
6.2.5    Background Document Review ........................................15
6.2.6    Monthly Progress Reports................................................15

6.3    Task 3 - Community Relations ...............................................15

6.4    Task 4 - Pre-Design Work Plan ..............................................16
6.4.1    Remedial Design Quality Assurance Project Plan ..........16
6.4.2    Field Sampling and Analysis Plan ...............................17
6.4.3    Health & Safety Plan ....................................................18
6.4.4    Addenda to QAPP, FSAP, and HSP................................18

6.5    Task 5 - Pre-Design Field Work ............................................18

6.6    Task 6 - Sample Analysis/Validation .....................................19

6.7    Task 7 - Data Evaluation......................................................19

6.8    Task 8 - Remedial Design ......................................................19
6.8.1    Remedial Design Work Plan ........................................20
6.8.2    Remedial Design/Project Plans Review........................20
6.8.3    Quality Assurance Project Plan ...................................23
6.8.4    Field Sampling and Analysis Plan ...............................24
6.8.5    RA Health & Safety Plan ..............................................24
6.8.6    Addenda to QAPP, FSAP, and HSP................................25

6.9    Task 9 - Engineering Services During Design & Construction .................25

7.0    CONTENT OF SUPPORTING PLANS ...............................................26

7.1    Quality Assurance Project Plan...............................................26

7.2    Field Sampling and Analysis Plan ...........................................27

7.3    Health and Safety Plan ..........................................................28

7.4    Construction Quality Assurance Plan.......................................28

7.5    Operation and Maintenance Plan.............................................29

7.6    Contingency Plan ...................................................................30

7.7    Performance Standard Verification Plan .................................30

8.0     REMEDIAL ACTION TASKS TO BE PERFORMED.............................................32

        8.1     Task 1 - Contractor Procurement (PRP Activity)......................................32

        8.2     Task 2 - Community Relations .......................................................................32

        8.3     Task 3 - Preconstruction Conference............................................................32

        8.4     Task 4 – RA Construction and Related Activities .......................................33
                8.4.1   Administrative Documents................................................................33
                8.4.2   Construction Activities .....................................................................33

        8.5     Task 5 - Oversight of Construction Activities ..............................................34

        8.6     Task 6 - Prefinal Construction Conference and Prefinal Inspection .........34

        8.7     Task 7 - Preliminary/Interim Closeout Report Assistance ..........................34

        8.8     Task 8 - Final Inspection ...............................................................................35

        8.9     Task 9 - Project Closeout................................................................................35

9.0     LONG-TERM O&M .................................................................................................36

## 1.0    INTRODUCTION

In accordance with the March 30, 2000 Record of Decision ("ROD") for the MIG/DeWane Landfill Site ("Site"), the Potentially Responsible Parties ("PRPs") are required to implement the selected remedial action alternative at the Site. This remedial action alternative was selected by the Illinois Environmental Protection Agency ("Illinois EPA"), with the concurrence of the United States Environmental Protection Agency ("U.S. EPA") based on data gathered during the Remedial Investigation ("RI") and the Focused Feasibility Study ("FFS") for the Site. This Statement of Work ("SOW") provides a framework for implementation of the remedial action ("RA"). All work to be performed by the PRPs pursuant to the attached RD/RA Consent Decree ("CD") shall be under the direction and supervision of a qualified professional engineer registered in Illinois, a registered/certified geologist, or other person qualified to work in hazardous material management projects.

### 1.1    Purpose

The selected RA is designed to protect human health and the environment in accordance with the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") of 1980, as amended by the Superfund Amendments and Reauthorization Act ("SARA") of 1986, and the National Oil and Hazardous Substance Pollution Contingency Plan ("NCP"). The purpose of this SOW is to set forth requirements for the remedial design ("RD") of the RA, as well as the final RA alternative set forth in the ROD for the Site, which was signed by the Illinois EPA on March 30, 2000, with concurrence by the U.S. EPA Region V on March 31, 2000. The PRPs' contractors shall follow the ROD, the SOW, the approved RD Work Plan, U.S. EPA Superfund Guidance, and other applicable guidance provided by U.S. EPA for conducting an RD/RA.

### 1.2    Site Description

The Site, also known as Boone Landfill, Bonus Landfill, or Kennedy Landfill, is located in Boone County, Illinois approximately 0.25 miles east of the City of Belvidere and 0.5 miles north of U.S. Business Route 20. The Site is located primarily in the south half of the southeastern quarter of Section 30, Township 44 North, Range 4 East. The Site is bounded on the north by the Chicago and Northwestern railroad tracks, and the Commonwealth Edison right-of-way. North of the railroad tracks is an agricultural field that extends to the Kishwaukee River. Agricultural and commercial properties are located to the east and south of the Site. A soil borrow pit, used to provide soil for the Site's interim cap, is immediately adjacent to the west of the Site. Further west of the Site is a residential housing development known as the Wycliffe Estates subdivision.

The Site occupies and area of approximately 47+ acres and rises to a height of approximately 50 to 55 feet above the surrounding terrain. The Site consists of a landfill and leachate surface impoundment. The surface impoundment was constructed to receive leachate from the eastern area of landfilling operations through a gravity flow leachate collection system. A landfill gas extraction system composed of two vents for passive gas removal had been installed on the crest of the Site prior to the Site being abandoned in 1988 by M.I.G. Investments, Inc.

## 1.3    Site History

The Site operated as a landfill from 1969 until 1988. The Site contains a municipal landfill that received residential, municipal, commercial and industrial wastes. The Site is classified as a Type I landfill. A Type I landfill is a co-disposal facility where hazardous wastes were disposed of with municipal solid wastes. The landfill activities (or lack thereof) that lead to the current problems at the Site include the disposal of various types of wastes as well as the improper covering of the landfill wastes, and improper Site contouring for surface water drainage.

From at least 1968 to 1983, the Site property was owned by Mr. Raymond DeWane and Ms. Jean Farina (and, until his death, Mr. John L. DeWane). In 1983, the property ownership was transferred to a Trust. In 1991, ownership of the Site property was transferred to L.A.E., Inc. At the time, Raymond E. DeWane and Jean A. Farina were the sole L.A.E. shareholders.

From 1969 to 1988, the Site property was leased by various individuals and companies, including: Mr. Jerome Kennedy, Mr. J. D. Mollendorf, Boone Landfill Inc., Boone Disposal Co., Bonus Landfill Co., Rockford Disposal Service, Inc., National Disposal Service, Inc., Browning-Ferris Industries of Rockford, Inc., and M.I.G. Investments, Inc. During the 1969 to 1988 time period, the Site was operated as a landfill by the above-listed entities.

In February 1969, the landfill was registered with the State of Illinois and disposal operations began in the area of the former gravel pit. The State of Illinois landfill permits required the placement of a five-foot compacted clay liner across the bottom of the pit. During 1975, a gravitational flow leachate collection system was installed in the area that now comprises an area that approximates the eastern most 1/3 of the Site. The system was designed to allow for leachate to be collected and drained through gravitational flow into an on-Site clay-lined leachate collection surface impoundment, which measured approximately 130 ft., by 130 ft., by 10 ft. deep.

In June 1988, a court-ordered injunction was issued against M.I.G. Investments for violations of its operating permit. Landfill operations ceased at the Site in June 1988. In July 1988, the Site was abandoned. The Site did not have adequate cover and did not meet other State of Illinois regulations.

On August 30, 1990, the Site was placed on the National Priorities List ("NPL"). On October 29, 1990 the U.S. EPA and a previous landfill operator, Browning-Ferris Industries of Illinois, Inc. ("BFI") entered into an Administrative Order on Consent ("AOC1") for BFI to maintain the leachate surface impoundment. The impoundment maintenance included reducing leachate levels and repairing the impoundment berms. Prior to AOC1, the Illinois EPA and U.S. EPA, on more than one occasion, determined it was necessary to hire contractors for emergency removal actions to reduce the leachate levels within the impoundment, to prevent overflowing.

On March 29, 1991, various PRPs, the Illinois EPA and the U.S. EPA entered into another Administrative Order on Consent ("AOC2"). Among other things, AOC2 required the PRP signatories to undertake an RI/FS for the entire Site.

Interim remedial actions were undertaken during 1991 and early 1993, to stabilize the Site. These actions included the remediating of numerous leachate flows by the placement of an interim landfill cap. Additional interim remedial actions also occurred.

The RI commenced during mid-1993 and the final RI Report was completed in July 1997. In February 1999, the final FFS that discusses and compares the potential clean-up remedial alternatives was completed. Early in 1999 gas probes were installed along the western soil borrow pit area boundary. In late April and early May 1999, as an emergency action, extraction wells and an interceptor trench were installed and activated to remove landfill gas migrating off-Site. Also, gas and groundwater sampling probes were installed in the Wycliffe Estates subdivision during early 1999. Gas extraction system and gas probe sampling has been occurring since 1999. In March 2000 the ROD was signed.

## 2.0 DESCRIPTION OF THE REMEDIAL ACTION/PERFORMANCE STANDARDS

The selected remedial alternative for the RD/RA was chosen by the Illinois EPA with the concurrence of the U.S. EPA after a detailed analysis of the alternatives included in the FFS, and a review of public comments. The RD Contractor(s) shall design the RA to meet the performance standards and specifications set forth in the ROD, CD, and this SOW. The RD shall include performance standards and specification such as cleanup standards, standards of control, quality criteria, and other substantive requirements, criteria, or limitations including all applicable or relevant and appropriate requirements ("ARARs") set forth in the ROD, CD, and this SOW.

The RA Contractor(s) shall implement the RA as set for in the ROD, CD, and the RA Work Plan. The RA Contractor(s) shall submit a RA Work Plan that includes a detailed description of the remediation and construction activities. The RA Work Plan shall include a project schedule for each major activity and submission of deliverables generated during the RA. The RA Contractor(s) shall submit a RA Work Plan in accordance with Paragraph 63 of the CD and this SOW.

The RD/RA will address three major areas of concern: leachate; groundwater; and landfill gas. The function of this RA is to control the Site as a source of groundwater contamination, to remediate groundwater, reduce the risks associated with exposure to contaminated materials, to prevent untreated leachate from leaving the Site, and to intercept landfill gases migrating from the Site. The three major areas of concern will be remediated through the installation and/ or implementation of at a minimum the following: (1) a landfill gas management program; (2) institutional controls, access restrictions and deed restrictions; (3) storm water management/surface water diversion system; (4) closure of the leachate surface impoundment; (5) leachate collection and management system; (6) groundwater remediation and management (through natural attenuation); and (7) a multi-layer landfill cap.

## 2.1 Landfill Gas Management Program

The landfill gas management program includes a landfill gas collection and treatment system with both passive and active components, and long-term gas monitoring. At present there exist 2 passive

gas vents located within the landfill area, a gas interceptor and collection trench located immediately west of the landfill area, 6 gas extractions wells along the western edge of the soil borrow pit, and a gas flare system. An additional 15 passive gas vents, or an alternate number of vents approved by the Illinois EPA based on a technical demonstration as part of the RD, will be installed within the interior of the landfill area. Six gas probes have been installed within the landfill area and another 12 have been installed in areas to the west of the Site. A plan for continuing operation of the existing active gas management system components will be evaluated as part of the RD.

The passive gas vents within the landfill area, if necessary, can be upgraded to an active system. Additional gas control measures as described in the FFS and included in the ROD, will be installed as needed. The landfill gas collection system will be designed to meet the applicable landfill standards pursuant to 35 Illinois Administrative Code ("IAC") Part 811, and as is determined to be necessary to protect human health and the environment. The present landfill gas monitoring system will be enhanced. Landfill gas management will meet all ARARs. The RA Contractor(s) will contain and remediate gases generated from the Site by the construction and operation of an active and passive gas collection system and monitoring program, as per the ROD, this SOW, and pursuant to ARARs.

## 2.2 Institutional Controls, Access Restrictions and Deed Restrictions

Institutional controls including site security fences, zoning restrictions, deed restrictions/restricted covenants, and adherence to local ordinances restricting groundwater use will be implemented to restrict access to the Site, especially the contaminated groundwater, leachate, and landfill gas and remedial control systems. The RA Contractor(s) shall install and maintain a fence at the Site to prevent access and vandalism to the Site. Fencing of the Site shall consist of a chain-link fence around the perimeter which is a minimum six-feet high with a minimum three-strand barbed wire. Warning signs shall be posted at 200-foot intervals along the fence and at all gates. The warning signs shall advise that the area is hazardous due to chemicals in the soils, leachate and groundwater which pose a risk to public health through direct contact with the soils, leachate and groundwater. The signs shall also provide a telephone number to call for further information. The fence (including signs) shall be completed within 30 days of the entry of the CD.

Deed restrictions shall be prepared and recorded against the Site and the adjacent soil borrow pit prohibiting on-Site groundwater use, construction of buildings and its related activities, and any drilling, excavating or other soil intrusive activities by owners or occupants of the Site property except for the purposes of RD/RA, sampling and monitoring, and constructing and maintaining components of the selected remedy. Within 15 days after the entry of the Consent Decree, Settling Defendants/PRPs shall execute and record with the Boone County recorder the restrictive covenant/deed restrictions in an appendix of the CD.

The areas to the north, northwest and west of the Site will be designated as a Groundwater Management Zone ("GMZ"). The area to the north of the Site is the agricultural field located between the landfill and the Kishwaukee River. The area to the west, northwest includes the soil borrow pit area, the area containing the Wycliffe subdivision, and the agricultural field/land north to

the Kishwaukee River. The RA Contractor(s) shall under take the groundwater containment by the GMZ and groundwater remediation by Monitored Natural Attenuation. However, if Monitored Natural Attenuation is not successful within the GMZ, then the contingency for additional leachate removal may be implemented, or in-situ remedial alternatives may be implemented as approved by the Illinois EPA. The RA Contractor(s) shall remediate the contaminated groundwater as per the ROD, CD, this SOW, and pursuant to ARARs. In addition to institutional controls, access restrictions, and deed restrictions, local zoning and health department ordinances will be enforced to prevent access to contaminated groundwater.

## 2.3    Storm Water Management/Surface Water Diversion System

Storm water controls will be constructed, such as grades, terraces, gravel or rip/rap lined drainage ditches and berms as part of a surface water diversion system to prevent landfill cover erosion, surface water ponding, and restrict precipitation infiltration into the landfill area. This system will include water drainage ditches around the toe of the landfill area, storm water retention pond(s) as needed, and corresponding water discharge routes. Erosion control measures and structures will be implemented where necessary. Storm water management will meet all ARARs, and state and federal regulations. The RA Contractor(s) shall install a storm water/surface water run-off, diversion and drainage system for the Site as per the ROD, CD, this SOW, and pursuant to ARARs. Erosion control measures and structures will be implemented where necessary.

## 2.4    Closure of Leachate Surface Impoundment

All surface impoundment liquids and a minimum of two feet of sediments will be removed. The liquids will be treated and disposed of in an approved manner. The sediments will be disposed of in the Site or in an otherwise approved manner. The empty surface impoundment will then be filled with clean soil. A leachate collection and management system will be installed to replace the leachate surface impoundment. The RA Contractor(s) will close the on-Site leachate surface impoundment by removing liquids and sediments as per the ROD, CD, this SOW, and pursuant to ARARs.

## 2.5    Leachate Collection and Management

The leachate collection system will include the originally installed gravity controlled system with a collection tank to replace the surface impoundment, and collection trenches to be located on the Site in the area of major leachate seeps. The leachate collection system will mitigate leachate surface seeps and reduce hydrostatic pressure within the Site, thus reducing leachate migration within the Site to groundwater. The localized leachate collection and drainage trenches will use a system of permeable bed layers, or passive trenches to be installed in major leachate seep areas, as determined necessary. Vertical leachate extraction wells, or other contingent leachate management options, as discussed below, will be installed in areas where there is a need based on the internal hydrostatic pressure measurements and engineering determinations.

Vertical leachate collection wells, if necessary, will be operated under gravity or artesian conditions for a period of time necessary to reduce localized head buildups to sufficient levels that minimize and stop seeps. If, however, leachate must be removed in a shorter time frame than can be achieved by gravity operation to mitigate present and/or future seeps, active interior leachate extraction must be implemented as a contingent remedial action measure to address groundwater contamination, surface water regulations or other ARARs, then vertical leachate extraction wells will be fitted with submersible pumps to perform active extraction for a limited duration until the remedial objectives are met. The collected leachate will be treated on-Site or transported off-Site for treatment and disposal. Additional possible contingent leachate removal options include the following:

1. A perimeter trench system can be constructed along key lengths proximate to identified areas of leachate accumulation;
2. Horizontal well laterals can be installed along the base of the refuse burial area;
3. Passive gas vent wells located in areas of leachate accumulation can be retrofitted to operate as leachate extraction wells; and
4. Any combination of the three leachate removal alternatives described above can be implemented.

The additional leachate removal options will be used if either of the following scenarios occurs: (1) design analysis based on pre-design leachate monitoring data indicates that leachate removal must be accompanied in a shorter time frame to mitigate seep conditions; or (2) in the event that the corresponding trigger mechanism criteria described in the Groundwater Monitoring Plan are exceeded. Additional leachate removal details are included in the ROD and FFS documents.

The extent of passive leachate collection trenches, permeable interceptor beds, or other contingent leachate removal components as described in the FFS will be established as part of the RD using additional data obtained during pre-design and sampling investigation and study. An engineering evaluation of future seep potential and a leachate head drawdown analysis will occur. The extent of these leachate removal components of the RA will be sufficient to collect and convey leachate that flows to the trench, bed, or other leachate management component, mitigate seep potential dissipate high leachate heads, and work effectively with the landfill cap to meet the RA objectives.

The leachate removal and management program will meet all ARARs. The RA Contractor(s) shall install a leachate collection system such that leachate shall be pumped/drained from the landfill and treated. The leachate collection and monitoring system shall comply with the ROD, CD, this SOW, and pursuant to ARARs. The leachate collection and monitoring will occur as containment to minimize the landfill contaminant migration to groundwater, surface water, soil, and air.

## 2.6    Groundwater Remediation and Management

A groundwater management and monitoring program will be implemented consistent with the requirements of the ROD. The remedy as included in the ROD does not require the implementation of an active groundwater remedy because the relatively low contamination levels of groundwater are expected to be remediated through the use of Monitored Natural Attenuation and other remediation components for the Site. The monitoring program will be consistent with 35 IAC 620.505 and 620.510. A groundwater management zone as described in 35 IAC Part 620 shall be established for areas undergoing remediation. The related groundwater management components include capping the landfill area, reducing gas pressure, and the removal of leachate at the contaminant source in the Site. Also, long-term groundwater monitoring will occur both on-Site and off-Site. If groundwater monitoring determines that Monitored Natural Attenuation is not effective, then the contingency for additional leachate removal may be implemented, or in-situ remedial alternatives may be implemented as approved by the Illinois EPA. Long-term monitoring will provide sampling data at regular intervals.

Applicable U.S. EPA Monitored Natural Attenuation requirements and guidance will be met or otherwise additional technologies will be implemented to remediate groundwater to water quality criteria for Class I aquifers.

Pursuant to the requirements of 35 IAC 724.195, a groundwater point of compliance shall be established at the Site boundary. Groundwater remediation and management will meet all ARARs. A long-term groundwater monitoring program will be established and maintained. After the RA is implemented, an assessment or review of the RA will be completed every five years, in the form of a Five Year Review.

Groundwater monitoring will include annual monitoring for the parameters in Appendix I at 35 IAC 724.195 for the first five years, and as defined in the ROD, quarterly for seven VOC chemicals of concern (i.e., benzene, 1,1-dichloroethylene, 1,2-dichloropropane, methylene chloride, tetrachloroethylene, trichloroethylene, and vinyl chloride), target inorganic compounds (i.e., antimony, arsenic, chromium, iron, lead, manganese, mercury, nickel, and boron), and relevant water quality and natural attenuation evaluation parameters following completion of the RA. The evaluation or "indicator" parameters will depend on the attenuation mechanisms that are being relied on to cleanup the groundwater. The groundwater monitoring program details will be refined during the RD stage, as will criteria acceptable to Illinois EPA to adjust the monitoring program. The RA Contractor(s) shall implement long-term groundwater monitoring per the ROD, CD, this SOW, and pursuant to ARARs. The long-term groundwater monitoring program will provide information on natural attenuation's progress towards achieving the clean-up objectives by providing sampling data on contaminant migration within the groundwater.

## 2.7    Landfill Cover/Cap

A multi-component landfill cap and cover system will be constructed and maintained to meet the required landfill standards and related ARARs (i.e., 35 IAC Part 811). The cap will meet the CERCLA requirements for RCRA hazardous waste disposed of in a municipal landfill. The cap will cover the entire landfill. The landfill vegetative cover will be maintained to the maximum extent possible before, during, and after construction. The cap will meet all ARARs.

The landfill cap will consist of a vegetative layer of at minimum 6 inches in depth over the entire landfill cap. Below and adjacent to the vegetative layer will be the landfill protective layer. Unless an alternative thickness is approved by Illinois EPA, the protective layer on the crest of the landfill will be 24 inches thick, tapering to a minimum of 18 inches thick at the toe of the landfill area side slopes. Unless an alternative thickness is approved by Illinois EPA, the protective soil layer and vegetative layer on the crest or top of the landfill area (approx. 19 acres) will have a minimum combined total depth of 30 inches. The 30 inch cover depth with then gradually taper to a combined minimum 24 inch total depth of the soil protective layer and vegetative cover at the landfill area slope toe. The tapering and reduction in the depth of the protective layer is due to engineering problems associated with the closeness of the landfill cap to the property boundaries and physical barriers such as railroad tracks and buried fiber optic cables. With the approval of the Illinois EPA, existing soils on site soils that meet project specifications (which will define acceptable chemical and physical parameters) may be re-used for the vegetative and protective layers.

Below and adjacent to the soil protective layer will be a geosynthetic drainage layer consisting of a geonet and geotextile combination, or alternative drainage materials demonstrated in the R D by the PRPs to be of equivalent performance subject to the approval of the Illinois EPA. Next, below and adjacent to the drainage layer will be the low permeability layer, which will be composed of a Geosynthetic-Clay Layer ("GCL"), or a geomembrane liner material demonstrated in the RD to be of equivalent performance subject to the approval of the Illinois EPA. Any technical equivalency demonstration submitted to Illinois EPA must show compliance with 35 IAC Part 811 and address technical aspects such as hydraulic barrier performance, slope stability, long-term durability, freeze-thaw behavior, and constructability. If a GCL is used, the GCL will consist of a combination bentonite/clay layer between a geosynthetic flexible membrane and a geotextile layer.

Below and adjacent to the geosynthetic low permeability layer will be the subsoil/grading layer for the landfill cap. A compacted soil layer, with a minimum depth of 12 inches (after compaction) will be placed and compacted to provide a foundation for the other cap components and to protect the low permeability layer from the landfill contents, and possible structural subsidence. With the approval of Illinois EPA, existing soils on site that meet project specifications (which will define acceptable chemical and physical parameters) may be used for this foundation layer.

The RA Contractor(s) shall design and construct a landfill cover that meets or exceeds the remedy as stated in the ROD, this SOW, and pursuant to ARARs. The landfill cover shall include various component layers, including a vegetated layer as specified by the ROD, this SOW, and pursuant to and ARARs. Construction of the cover/cap system will minimize the infiltration of precipitation into

-12-

the landfill, thus reducing the generation of leachate, landfill gases, and the migration of contaminants to groundwater, soil, and air. The RA Contractor(s) shall conduct landfill gas, groundwater and leachate remediation and/or removal and monitoring, as well as, routine monitoring inspections and operation maintenance of the landfill cover as part of the long-term requirements to be established in the RA and O&M as required pursuant to the ROD, CD, this SOW, and ARARs.

## 3.0    OPERATION & MAINTENANCE

An appropriate program for long-term Operation and Maintenance ("O&M") of the Site and all components for the RA will be developed and implemented. The PRPs will be required to develop and draft an Operation and Maintenance Plan ("O&M Plan") that covers all aspects of the remedial action including the landfill cap, and gas and groundwater monitoring and remediation.

The draft O&M Plan will be revised once the remedial action is completely built and the as-built plans are available. The list of general requirements for the Site O&M Plan is included below in Section 7.

## 4.0    SCOPE OF REMEDIAL ACTION PROGRAM

Any existing or potential threats associated with direct contact with wastes or contaminant migration through any media pathway will be effectively remediated. Each component of the remedial action program will be performed as described in the RD/RA Work Plans. Due to the wide variety of types of work to be performed, the components of this program may be performed by separate remedial contractors working independent of each other but under the direction of the Site Supervising Contractor.

## 5.0    SCHEDULE

Preliminary schedules for remedial design and remedial action will be submitted with the RD/RA Work Plans and will serve as a framework for manpower and budget planning for the remedial program. The schedules will be structured to allow for timely design, construction, and operation of the remedial components of this program.

The schedules will provide estimates of the time required to complete various tasks. Some timing and scheduling requirements are prescribed by the CD. Other timing requirements, such as for phased design submittals and remedial action planning and completion documents, will be developed as part of the RD/RA Work Plans.

## 6.0    REMEDIAL DESIGN TASKS

The RD Contractor(s) shall design the RA to meet the performance standards and specifications set forth in the ROD and this SOW. Performance standards shall include cleanup standards, standards of control, quality criteria, and other substantive requirements, criteria, or limitations including all ARARs set forth in the ROD and SOW.

-13-

The components of the selected remedial design activity are as follows:

Task 1 - Contractor Procurement
Task 2 - Project Planning
Task 3 - Community Relations
Task 4 - Pre-Design Work Plan
Task 5 - Pre-Design Field Work
Task 6 - Sample Analysis/Validation
Task 7 - Data Evaluation
Task 8 - Remedial Design
Task 9 - Engineering Services During Design and Construction

## 6.1  Task 1 - Contractor Procurement

Upon or before the entry of the CD, the PRPs shall complete the necessary steps and follow the appropriate procedures to procure the services of a contractor to conduct the RD activities for the Site. The PRPs shall direct the RD Contractor(s) to begin planning the specific activities that will need to be conducted as part of the RD.

## 6.2  Task 2 - Project Planning

This task consists of meeting preparation, an initial meeting, an on-site visit and meeting, and preparation of meeting minutes to document relevant activities.

### 6.2.1  Meeting Preparation

The PRPs or their consultants will prepare preliminary information and appropriate discussion agenda items prior to each meeting between the PRPs and the Illinois EPA.

### 6.2.2  Initial Meeting

An initial meeting will be held in Springfield, Illinois, or any location to which the Illinois EPA and the PRPs agree, to discuss the overall project plans and scope of work for each major component of the RD program. The initial meeting and Site inspection meeting will be combined unless it is agreed by the PRPs and Illinois EPA to hold separate meetings.

### 6.2.3  Site Inspection

An on-Site inspection and meeting will be conducted and include a Site inspection of the areas to be affected by major remedial components. The on-Site meeting will include the project managers (or assignees) from the PRPs, the RD Contractor(s), and the Illinois EPA. The Site visit during the project-planning phase should assist the RD Contractor(s) in developing a conceptual understanding of the Site in order to plan for the RD.

-14-

The PRPs and/or RD Contractor(s) will have a Site safety plan in place during the on-Site inspection and meeting. The assumption has been made that Level D protection will be utilized during the Site inspection.

**6.2.4   Preparation of Minutes**

During the initial and subsequent on-Site meeting, the significant points of discussion will be recorded. Meeting minutes will be distributed to all attendees. Action item schedules will be discussed between key remedial design team members and other project personnel.

**6.2.5   Background Document Review**

As part of the planning effort, the RD Contractor(s) shall review the following background information to familiarize itself with the Site:

1.   Final RI Report from the RI/FS for the Site;
2.   FFS Report for the Site;
3.   the ROD for the Site; and
4.   this SOW.

**6.2.6   Monthly Progress Reports**

The PRPs shall submit to the Illinois EPA Monthly Progress Reports that, at a minimum, shall contain information on the following items:

1.   Status of work and the progress to date;
2.   Percentage of the work completed and the status of the schedule;
3.   Difficulties encountered and corrective actions to be taken;
4.   The activities in progress;
5.   Activities planned for the next reporting period; and
6.   Any changes in key personnel.

**6.3   Task 3 - Community Relations**

The Illinois EPA will be primarily responsible for community relations activities at the Site. The community relations program will be integrated closely with all remedial action activities to ensure community understanding of actions being taken and to obtain community input during the RD.

The PRPs will provide appropriate assistance to the Illinois EPA in its development and implementation of the community relations program. Illinois EPA-led community relations activities for the Site will include, but may not be limited to, the following:

1.   Preparation of a Community Relations Plan ("CRP") based on interviews with community representatives and leaders by state agency staff. The CRP will describe the types of information to be provided to the public and outline the opportunities for

community comment and input during the RD. Deliverables, schedule, staffing, and budget requirements will be included in the CRP;

2. Establishment and maintenance of a community information repository(s), one of which will house a copy of the administrative record;

3. Preparation and dissemination of news releases, fact sheets, slide shows, exhibits, and other audio-visual materials designed to apprise the community of current or proposed activities;

4. Development and upkeep of a mailing list that includes nearby and interested residents, public interest groups, and elected officials;

5. Arrangements of briefings, press conferences, workshops, and public and other informal meetings;

6. Analysis of community attitudes toward the proposed RD and RA;

7. Assessment of the successes and failures of the community relations program to date; and

8. Preparation of reports and participation in public meetings, project review meetings, and other meetings as necessary for the normal progress of the work.

Deliverables and the schedule for submittal will be identified in the CRP. The CRP will be revised or amended as is determined to be necessary by the Illinois EPA.

## 6.4    Task 4 - Pre-Design Work Plan

The RD Contractor(s) shall prepare and submit a Pre-Design Work Plan to provide information necessary to fully implement the remedial design. The Pre-Design Work Plan shall include, at a minimum, a Remedial Design Quality Assurance Project Plan ("RD-QAPP"), a Health and Safety Plan ("HSP"), and a Field Sampling and Analysis Plan ("FSAP"). The Pre-Design Work Plan may include all of the requirements of the plans as identified in Section 6.8 and may be periodically amended to complete the remainder of the RD and RA.

### 6.4.1   Remedial Design Quality Assurance Project Plan

An RD-QAPP will be developed by the RD Contractor(s) and approved by the Illinois EPA as part of the Pre-Design Work Plan. The RD-QAPP will be prepared in a phased manner involving review and incorporation of the Illinois EPA comments. The RD-QAPP document will be an independent document specific for the project and will include all sections described in Section 7 of this SOW. The RD Contractor(s) shall prepare the RD-QAPP to address the types of investigations and monitoring to be conducted during the pre-design and design phases. The RD-QAPP should include a project description, a project organization chart illustrating the lines of responsibility of the personnel involved in the sampling phase of the project, quality assurance objectives for data such as the required precision and accuracy, completeness of data, representativeness of data, comparability of data, and the intended use of collected data, sample custody procedures during sample collection, in the laboratory, and as part of the final evidence files, the type and frequency of calibration procedures for field and laboratory instruments, internal quality control checks, quality assurance performance audits and system audits, preventive maintenance procedures and schedule and

-16-

corrective action procedures for field and laboratory instruments, specific procedures to assess data precision, representativeness, comparability, accuracy, and completeness of specific measurement parameters, and data documentation and tracking procedures. Standard operating procedures for QA/QC that have been established by U. S. EPA will be referenced and not duplicated in the RD-QAPP.

For each of the major components of the program, it will be necessary to develop Site-specific protocols for each particular activity. Protocols to be developed and analyzed for each major component that will affect the RD-QAPP will include air sampling (both on and off-site) for landfill gas and particulates, and groundwater and leachate sampling and monitoring. For all types of sampling, the sample collection methods, analytical schemes, and frequency of testing will be developed.

Air sampling protocols will include landfill gas and particulate sampling before, during, and after excavation and/or soil intrusive activities. Air sampling will be subject to the requirements of 35 IAC Part 811 and the ROD. Groundwater sampling and analysis protocols will be developed. The protocol will include initial sample collection from groundwater point of compliance wells and analysis of relevant parameters. Subsequent groundwater sampling will be performed and analyzed for the constituents identified from the initial sample analysis pursuant to 35 IAC Parts 620 and 811/814, related regulations, and the ROD. Leachate sampling protocols will be developed for the surface impoundment and leachate flows or seeps. Leachate sampling and analysis will be subject to 35 IAC Part 811 and the ROD.

### 6.4.2 Field Sampling and Analysis Plan

A FSAP will be established to ensure that sample collection and analytical activities during the pre-design and design phases are conducted in accordance with technically acceptable protocols and that the data generated will meet the established data quality objectives. The FSAP shall define in detail the sampling and data-gathering methods that will be used to obtain additional site data for this project. It will contain an evaluation explaining what additional data are required to adequately design the remediation activities. The FSAP shall include all the sections described in Section 7.2 of this SOW. It shall include project objectives and organization, functional activities, sampling objectives, proposed sample locations, sampling frequency, sampling and field analysis equipment and procedures, sample compositing (if conducted), and sample handling. The FSAP will reference the RD-QAPP for QA/QC protocols to be used to achieve the established data quality objectives. The data quality objectives shall reflect use of analytical methods for obtaining data of sufficient quality to meet NCP requirements. In addition, the FSAP will contain a laboratory quality assurance plan that addresses personal qualifications, sampling procedures, sample custody, analytical procedures, and data reduction, validation, and reporting. The FSAP shall contain a schedule stating when events will take place and when deliverables will be submitted.

### 6.4.3 Health & Safety Plan

The PRPs will develop a HSP on the basis of site conditions to protect both personnel involved in pre-design and design activities and people in the surrounding community. The Illinois EPA will review and comment, if necessary, on the HSP. A copy of the final HSP and all addenda to the HSP will be kept at the Site. The HSP will address all applicable regulatory requirements contained in 20 CFR 1910.120(i)(2)--Occupational Health and Safety Administration, Hazardous Waste Operations and Emergency Response, Interim Rule, December 19, 1986; U.S. EPA Order 1440.2--Health and Safety Requirements for Employees Engaged in Field Activities; U.S. EPA Order 1440.3--Respiratory Protection; U.S. EPA Occupational Health and Safety Manual; and U.S. EPA Interim Standard Operating Procedures (September 1982). The HSP shall include all the sections described in Section 7.3 of this SOW. The HSP will provide a Site background discussion and describe personnel responsibilities, protective equipment, health and safety procedures and protocols, decontamination procedures, personnel training, and type and extent of medical surveillance. The plan will identify problems or hazards that may be encountered and how these are to be addressed. Procedures for protecting third parties, such as visitors or the surrounding community, will also be provided. Standard operating procedures for ensuring worker safety will be referenced and not duplicated in the HSP.

Prior to preparing the specifications for the HSP, the data collected from previous studies and tasks will be evaluated. The objective of this effort will be to evaluate the level of detail and specific Site hazards that must be addressed in the HSP. Results from previous tasks that have an impact on Site safety considerations will be reviewed. Chemical data and field notes from prior sampling and subsurface investigations will also be evaluated. Physical and chemical hazards that may be encountered will be reviewed. The evaluation of potential exposure of local citizens to hazardous substance will be of paramount importance. The results of this analysis will be used to prepare the HSP.

### 6.4.4    Addenda to QAPP, FSAP, and HSP

Addenda may be prepared to supplement the remedial design QAPP FSAP, or HSP (Plans), as necessary. Each addendum will be prepared in a phased manner involving review and incorporation of Illinois EPA comments prior to implementation of any Plan addendum.

### 6.5    Task 5 - Pre-Design Field Work

The RD Contractor(s) shall conduct pre-mobilization activities, including the procurement of a laboratory for sample analyses as necessary. The RD Contractor(s) shall implement the Pre-Design Work Plan and demobilize, accordingly. The RD Contractor(s) shall conduct sampling and analyses to define the nature and extent of organic and inorganic contamination that exists at the Site as necessary to implement the RD. In addition, the RD Contractor(s) shall conduct any necessary treatability studies to determine the effectiveness of the proposed RD/RA process.

Pre-design investigation activities will follow the plans developed in Tasks 2 and 4. Strict chain-of-custody procedures will be followed and all sample locations will be identified on a Site map. The

RD Contractor(s) will provide management and QC review of all activities conducted under this task.

## 6.6    Task 6 - Sample Analysis/Validation

The RD Contractor(s) shall develop a data management system including field logs, sample management and tracking procedures, and document control and inventory procedures for both laboratory data and field measurements to ensure that the data collected during the RD investigation activities are of adequate quality and quantity to support the RD/RA. Collected data should be validated at the appropriate field or laboratory QC level to determine whether it is appropriate for its intended use. Task management and quality controls will be provided by the RD Contractor(s). The U.S. EPA Contract Lab Program ("CLP") should be considered for use as appropriate for analysis of field samples. The PRPs or RD Contractor(s) will have primary responsibility for ensuring that validation of all data is performed in accordance with the approved RD-QAPP for the Site. The RD Contractor(s) will incorporate information from this task into the RD/RA.

Data validation will be required for all data collected during an initial period of field investigation, as required by the RD-QAPP and FSAP. If there are no significant problems with data validation for this initial period, then Illinois EPA may allow a reduction in data validation down to no less than ten percent of the data collected during subsequent phases.

## 6.7    Task 7 - Data Evaluation

The RD Contractor(s) shall analyze all RD investigation data and present the results of the analyses in an organized and logical manner so that the relationship between the data and the RD for each medium is apparent. The RD Contractor(s) shall design and set up an appropriate database for pertinent information collected. The RD Contractor(s) shall evaluate, interpret, and tabulate data in an appropriate presentation format for final data tables. The RD Contractor(s) shall submit a Pre-Design Study Report at the conclusion of the Pre-Design Work, which summarizes the pre-design studies and the associated data and results.

## 6.8    Task 8 - Remedial Design

In accordance with the schedule specified in the CD, the RD Contractor(s) will submit the RD Work Plan ("RDWP") to the Illinois EPA for approval. . The RDWP will describe the PRPs' plan for implementation of the RD within the terms and conditions of the CD, the ROD, and this SOW. As an option, the PRPs/RD Contractor(s) may prepare separate work plans for the RD and RA (construction) phases of the work. If separate work plans are prepared, the draft RAWP should be submitted at the pre-final design phase of the RD and finalized after selection of the RA Contractor(s).

## 6.8.1   Remedial Design Work Plan

The RD Contractor(s) shall prepare and submit to the Illinois EPA for approval an RDWP that shall document the overall management strategy for performing the RD, including tasks to be performed for meeting the requirements of this SOW. The RD Contractor(s) shall describe and document the responsibility and authority of all organizations and personnel involved with the implementation. The RD Contractor(s) shall develop an overall project schedule for implementation of the RD, which identifies timing, and specific dates for initiation and completion of all tasks. The RDWP and corresponding activity plans will be submitted to Illinois EPA, as specified in the CD or as agreed upon by the PRPs and Illinois EPA, for review and approval by the Illinois EPA.

The RDWP will contain at a minimum the following:

1. Site Description and Background;
2. Description of each task/deliverable;
3. Formation of the Design Team;
4. Requirements for surveying, mapping, or other additional field data collection;
5. A description of the design review process including a description of the content of each phased design submittal;
6. A schedule of completion of the design, including all required deliverables and design review meetings;
7. Items requiring clarification or anticipated problems;
8. Proposed personnel; and
9. Drawing register listing all drawings and specifications that will be prepared.

## 6.8.2 Remedial Design/Project Plans Review

RD is defined as those activities to be undertaken by the PRPs to develop the final drawings, specifications, general provisions, and special requirements necessary to translate the ROD into the remedy pursuant to this SOW and the CD. The final product of the RD is a technical package that contains, or addresses, all elements necessary to accomplish the RA including, in addition to technical elements, all design support activities, permitting and access requirements, and institutional controls.

## Design Reviews

After approval of the RDWP by the Illinois EPA, the RD Contractor(s) will implement the RDWP in accordance with the RD schedule contained therein. Such implementation shall include Illinois EPA review and approval of plans, specifications, submittals, and other deliverables. The purpose of the design reviews is for the Illinois EPA to assess the feasibility of the design(s) to achieve the RA goals and performance standards. Illinois EPA approval of design submittals is administrative in nature to allow the RD Contractor(s) to proceed to the next step. It does not imply acceptance of later design submittals that were not included in previous submittals, or that the remedy, when constructed, will meet performance standards or function properly and be accepted.

All plans and specifications shall be submitted in accordance with the schedule set forth in the RDWP and shall be developed in accordance with U.S. EPA's Superfund RD and RA Guidance (OSWER Directive No. 9355.0-4A). All plans and specifications shall demonstrate that the RA will meet all objectives of the ROD and this SOW, including all Performance Standards. The PRPs and/or RD Contractor(s) shall regularly with the Illinois EPA to discuss design issues. Also, the RD Contractor(s) shall submit each design to the Illinois EPA for review and comment.

In general, the RD will be submitted for approval in the following phased approach:

1. Preliminary Design - The scope of the preliminary design will address not less than 30% of the total design and will be based on data furnished for this project;
2. Intermediate Design - The RD Contractor(s) will present an Intermediate Design Briefing when the design effort is approximately 60% complete;
3. Prefinal Design - The Design will be submitted at 95% completion; and
4. Final Design - After approval of the Prefinal Design the required revisions will be incorporated into the Design and the final documents submitted 100% complete with the reproducible drawings and specifications ready for bid advertisement.

Phases identified above are suggested RD submittals and do not preclude the use of accelerated submittal mechanisms (i.e., eliminating 95% Design review or eliminating part of the Preliminary and Intermediate Design) as mutually agreed to by the Illinois EPA. For example, access controls and infrastructure portions of the selected remedy may be submitted separately in the Prefinal Design form for the Illinois EPA review and comment or approval to expedite installation. The PRPs will adequately address Illinois EPA comments on design submittals prior to implementing the subsequent design phase submittal.

Seven hard copies of each design submittal will be supplied to the Illinois EPA for each major component of the design. For scheduling purposes, 45 days will be allocated for the Illinois EPA's review and comments in between each of the design phases. Undisputed Illinois EPA comments from the previous phase will be incorporated into the next design phase.

**A.     Preliminary Design**

The RD Contractor(s) shall submit the Preliminary Design when the design effort is approximately 30% complete. The Preliminary Design submittal shall include or discuss, at a minimum, the following:

1. Preliminary plans, drawings, and sketches, including design calculations;
2. Results of treatability studies and additional field sampling;
3. Design assumptions and parameters, including design restrictions, process performance criteria, appropriate unit processes for the treatment train, and expected removal or treatment efficiencies for both the process and waste (concentration and volume);
4. Proposed cleanup verification methods, including compliance with ARARs;

-21-

5.      Outline of required specifications;
6.      Real estate, easement, and permit requirements; and
7.      Preliminary construction schedule, including contracting strategy.

**B.      Intermediate Design**

The RD Contractor(s) shall present an Intermediate Design Briefing when the design effort is approximately 60 % complete.  The Intermediate Design Briefing shall fully address all comments made to the Preliminary design submittal.  At the Intermediate Design Briefing, the RD Contractor(s) shall submit the following RA plans:

1.      Draft Construction Quality Assurance (CQA) Plan;
2.      Draft QAPP, as outlined in Section 6.8.4;
3.      Draft FSAP, as outlined in Section 6.8.5;
4.      Draft HSP, as outlined in Section 6.8.6; and
5.      Draft Contingency Plan, as described in Section 7.6.

**C.      Prefinal and Final Designs**

The RD Contractor(s) shall submit the Prefinal Design when the design effort is 95% complete and shall submit the Final Design when the design effort is 100% complete.  The Prefinal Design shall fully address all comments made to the preceding design submittal.  The Final Design shall fully address all comments made to the Prefinal Design and shall include reproducible drawings and specifications suitable for bid advertisement.  The Prefinal Design shall serve as the Final Design if the State has no further comments and issues the notice to proceed.

The Prefinal and Final Design submittals shall include those elements listed for the Preliminary Design, as well as, the following:

1.      Proposed siting/locations of processes/construction activity;
2.      Outline of long-term monitoring plan;
3.      Final Performance Standard Verification Plan;
4.      Final Construction Quality Assurance Plan;
5.      Final RA-QAPP/ HSP/FSAP/Contingency Plan;
6.      Capital and O&M Cost Estimate.  This cost estimate shall refine the FFS cost estimate to reflect the detail presented in the Final Design; and
7.      Final Project Schedule for the construction and implementation of the RA that identifies timing for initiation and completion of all critical path tasks. The final project schedule submitted as part of the Final Design shall include specific dates for completion of the project and major milestones.

-22-

### 6.8.3   Quality Assurance Project Plan

An RA-QAPP will be developed by the RD Contractor(s) and approved by the Illinois EPA for inclusion in each of the bidding documents that will be prepared for each of the major components of the remedial program for the Site. The RA-QAPP will be prepared in a phased manner involving review and incorporation of the Illinois EPA comments. The RA-QAPP document will be an independent document specific for the project, and shall have the content described in Section 7.1 of this SOW.

The RD Contractor(s) shall prepare the RA-QAPP to address the types of investigations and monitoring to be conducted during the remedial action. The RA-QAPP should include a project description, a project organization chart illustrating the lines of responsibility of the personnel involved in the sampling phase of the project, quality assurance objectives for data such as the required precision and accuracy, completeness of data, representativeness of data, comparability of data, and the intended use of collected data, sample custody procedures during sample collection, in the laboratory, and as part of the final evidence files, the type and frequency of calibration procedures for field and laboratory instruments, internal quality control checks, and quality assurance performance audits and system audits, preventive maintenance procedures and schedule and corrective action procedures for field and laboratory instruments, specific procedures to assess data precision, representativeness, comparability, accuracy, and completeness of specific measurement parameters, and data documentation and tracking procedures. Standard operating procedures for QA/QC that have been established by U. S. EPA will be referenced and not duplicated in the RA-QAPP.

QA/QC protocols to be developed for each major component that will affect the RA- QAPP include air sampling before and during construction (both on and off-site) for landfill gas (methane), total VOCs, and particulates, and groundwater and leachate sampling and monitoring.

Air sampling for landfill gas emissions will begin during construction phases. The protocols will include gas (methane), total VOC, and particulate sampling before, during, and after excavation and/or soil intrusive activities, personnel sampling and monitoring of ambient health and safety monitoring and construction workers. Air sampling will be subject to 35 IAC Part 811 and the ROD.

Groundwater sampling and analysis protocols will be developed. The protocols will include initial sample collection from groundwater point of compliance wells and analysis for relevant parameters as discussed in the ROD. Subsequent groundwater sampling will be performed and analyzed for the constituents identified from the initial sample analysis pursuant to 35 IAC Parts 620 and 811/814, and related regulations and the ROD.

Leachate sampling and analysis protocols will be developed for the surface impoundment, and leachate flows or seeps, and for on-Site treatment for off-Site disposal. Leachate sampling and analysis will be subject to 35 IAC Part 811, related regulations and the ROD.

Sampling and analysis protocols for the landfill final cover system will be subject to 35 IAC Part 811, related regulations and the ROD.

For all types of sampling, the sample collection methods, analytical schemes, and frequency of testing will be developed and submitted for approval to the Illinois EPA.

### 6.8.4    Field Sampling and Analysis Plan

A FSAP will be established to ensure that sample collection and analytical activities during the remedial action are conducted in accordance with technically acceptable protocols and that the data generated will meet the established data quality objectives. The FSAP shall include a field sampling and analysis plan and a laboratory analysis plan which include protocols and the laboratory quality assurance plan. The FSAP shall define in detail the sampling and data-gathering methods that will be used to obtain additional site data for this project. It will contain an evaluation explaining what additional data are required. It shall include the project objectives and organization, functional activities, sampling objectives, proposed sample locations, sampling frequency, sampling and field analysis equipment and procedures, sample compositing (if conducted), and sample handling. The FSAP will reference the RA-QAPP for QA/QC protocols to be used to achieve the established data quality objectives. The data quality objectives shall reflect use of analytical methods for obtaining data of sufficient quality to meet NCP requirements. In addition, the FSAP will contain a laboratory quality assurance plan shall address personal qualifications, sampling procedures, sample custody, analytical procedures, and data reduction, validation, and reporting. The FSAP shall contain a schedule stating when events will take place and when deliverables will be submitted.

### 6.8.5    RA Health & Safety Plan

The PRPs will develop a HSP on the basis of Site conditions to protect both personnel involved in RA and people in the surrounding community. The Illinois EPA will review and comment, if necessary, on the HSP. A copy of the final HSP and all addenda to the HSP will be kept at the Site. The plan will address all applicable regulatory requirements contained in 20 CFR 1910.120(i)(2)-- Occupational Health and Safety Administration, Hazardous Waste Operations and Emergency Response, Interim Rule, December 19, 1986; U.S. EPA Order 1440.2--Health and Safety Requirements for Employees Engaged in Field Activities; U.S. EPA Order 1440.3--Respiratory Protection; U.S. EPA Occupational Health and Safety Manual; and U.S. EPA Interim Standard Operating Procedures (September 1982). The HSP will provide a Site background discussion and describe personnel responsibilities, protective equipment, health and safety procedures and protocols, decontamination procedures, personnel training, and type and extent of medical surveillance. The plan will identify problems or hazards that may be encountered and how these are to be addressed. Procedures for protecting third parties, such as visitors or the surrounding community, will also be provided. Standard operating procedures for ensuring worker safety will be referenced and not duplicated in the HSP.

Prior to preparing the specifications for the remedial action HSP, the data collected from previous studies and tasks will be evaluated. The objective of this effort will be to evaluate the level of detail

and specific Site hazards that must be addressed in the remedial action HSP. Results from previous tasks that have an impact on Site safety considerations will be reviewed. Chemical data and field notes from the prior sampling and subsurface investigations will also be evaluated. Physical and chemical hazards that may be encountered will be reviewed. This will involve a "walk through" of the entire RA effort so that obvious safety hazards can be identified.

For each of the major components of the program an evaluation will be performed from a safety point of view that will include each applicable element of the following:

1. Landfill gas collection system construction;
2. Leachate collection system construction;
3. Leachate surface impoundment closure;
4. Cap and cover system construction;
5. Long-term maintenance; and
6. Long-term ground water monitoring well and gas probe installation.

The evaluation of potential exposure of local citizens to hazardous substance will be of paramount importance in "walking through" the program and evaluating various operation scenarios. The results of this analysis will be used to prepare the program HSP specifications.

The RA HSP will include individual responsibilities for implementation and compliance monitoring. The minimum requirements to be implemented are listed in Section 7.3, Content of Supporting Plans. The HSP specifications in Section 7.3 will present performance requirements, constraints, criteria, and requirements that each participating party, such as individual contractors, must address to be in compliance with the provisions set forth in the RA HSP.

### 6.8.6 Addenda to QAPP, FSAP, and HSP

The QAPP, FSAP, and HSP (Plans) will function as the initial Plans applicable to the RA. Each major component of the RA may, however, require varying specifics not addressed in the general Plans. Therefore, an addendum may be prepared for each of the major components of any Plan to supplement the initial Plan. Each addendum will be prepared in a phased manner involving review and incorporation of Illinois EPA comments prior to implementation of any Plan addendum.

### 6.9 Task 9- Engineering Services During Design and Construction

Engineering services will be provided by the PRPs on an ongoing basis as necessary. These services will include review, by their supervisory contractor, of construction contractors' submittals, serving as a representative on behalf of the PRPs for participation in relevant conference calls and meetings, project planning, and necessary field representation to oversee activities occurring at the project Site.

## 7.0    CONTENT OF SUPPORTING PLANS

The documents listed in this section -- the QAPP, the Contingency Plan, the HSP, the FSAP, the Construction Quality Assurance Plan, the O&M Plan, and the Performance Standard Verification Plan -- are documents which shall be prepared and submitted as outlined in this SOW. The following section describes the required contents of each of these supporting plans.

## 7.1    Quality Assurance Project Plan

The RD Contractor(s) shall develop a Site-specific QAPP, covering sample analysis and data handling for samples collected in all phases of future Site work, based upon guidance provided by U.S. EPA. The QAPP shall be consistent with the requirements of the U.S. EPA Contract Lab Program ("CLP") for laboratories proposed outside the CLP. Both the RD- and RA-QAPPs shall at a minimum include:

1.   Project Description
     a.   Facility Location History
     b.   Past Data Collection Activity
     c.   Project Scope
     d.   Sample Network Design
     e.   Parameters to be Tested and Frequency
     f.   Project Schedule

2.   Project Organization and Responsibility

3.   Quality Assurance Objective for Measurement Data
     a.   Level of Quality Control Effort
     b.   Accuracy, Precision and Sensitivity of Analysis
     c.   Completeness, Representativeness and Comparability

4.   Sampling Procedures

5.   Sample Custody
     a.   Field Specific Custody Procedures
     b.   Laboratory Chain of Custody Procedures

6.   Calibration Procedures and Frequency
     a.   Field Instruments/Equipment
     b.   Laboratory Instruments

7.   Analytical Procedures
     a.   Non-Contract Laboratory Program Analytical Methods
     b.   Field Screening and Analytical Protocol
     c.   Laboratory Procedures

8.    Internal Quality Control Checks
    a.    Field Measurements
    b.    Laboratory Analysis

9.    Data Reduction, Validation, and Reporting
    a.    Data Reduction
    b.    Data Validation
    c.    Data Reporting

10.    Performance and System Audits
    a.    Internal Audits of Field Activity
    b.    Internal Laboratory Audit
    c.    External Field Audit
    d.    External Laboratory Audit

11.    Preventive Maintenance
    a.    Routine Preventative Maintenance Procedures and Schedules
    b.    Field Instruments/Equipment
    c.    Laboratory Instruments

12.    Specific Routine Procedures to Assess Data Precision, Accuracy, and Completeness
    a.    Field Measurement Data
    b.    Laboratory Data

13.    Corrective Action
    a.    Sample Collection/Field Measurement
    b.    Laboratory Analysis

14.    Quality Assurance Reports to Management

## 7.2    Field Sampling and Analysis Plan

The RD Contractor(s) shall develop a FSAP (as described in "Guidance for Conducting Remedial Investigations and Feasibility Studies Under CERCLA," October 1988, the Site RI/FS, and any updated guidance directives). The RD and RA FSAPs should supplement the respective QAPPs and address all sample collection activities.

## 7.3    Health and Safety Plan

The RD Contractor(s) shall prepare and submit a HSP to address the studies and activities to be performed at the Site to implement the RD/RA. The HSP is designed to protect on-Site personnel and area residents from physical, chemical and all other hazards or potential hazards posed by the RA. The HSP shall develop the performance levels and criteria necessary to address the following areas. The HSP shall follow U.S. EPA guidance and all OSHA requirements as outlined in 29 CFR 1910.

1.    General requirements
2.    Personnel
3.    Levels of protection
4.    Safe work practices and safeguards
5.    Medical surveillance
6.    Personal and environmental air monitoring
7.    Personal protective equipment
8.    Personal hygiene
9.    Decontamination - personal and equipment
10.    Site work zones
11.    Contaminant control
12.    Contingency and emergency planning
13.    Logs, reports and record keeping

## 7.4    Construction Quality Assurance Plan

The RD Contractor(s) shall submit a Construction Quality Assurance Project Plan ("CQAP") that describes the Site-specific components of the quality assurance program that shall ensure that the completed project meets or exceeds all design criteria, plans, and specifications. The draft CQAP shall be submitted with the Prefinal Design and the final CQAP shall be submitted with the final design. The CQAP shall contain, at a minimum, the following elements:

1.    Responsibilities and authorities of all organizations and key personnel involved in the design and construction of the RA;
2.    Required qualifications of the Quality Assurance Official in terms of training and experience necessary to fulfill the identified responsibilities;
3.    Protocols for sampling and testing used to monitor construction;
4.    Identification of proposed quality assurance sampling activities including the sample size, frequency of testing, acceptance and rejection data sheets, problem identification and corrective measures reports, evaluation reports, acceptance reports, and final documentation. A description of the provisions for final storage of all records shall be included; and
5.    Reporting requirements for CQA activities shall be described in detail in the CQAP. This shall include such items as daily summary reports, inspection data sheets, problem identification and corrective measures reports, design acceptance reports,

-28-

and final documentation. Provisions for the final storage of all records shall be presented in the CQAP.

## 7.5    Operation and Maintenance Plan

The RD Contractor(s) shall prepare an O&M Plan to cover both implementation and long-term maintenance of the RA. An outline of the O&M Plan shall be submitted as a final Design Document submission. The final O&M Plan shall be submitted to Illinois EPA prior to the pre-final construction inspection, in accordance with the approved construction schedule. The O&M Plan shall be composed of the following elements:

1.    Description of normal operation and maintenance:
   a.    Description of tasks for operation;
   b.    Description of tasks for maintenance;
   c.    Description of prescribed treatment or operation conditions; and
   d.    Schedule showing frequency of each O&M task.

2.    Description of potential operating problems:
   a.    Description and analysis of potential operating problems;
   b.    Sources of information regarding problems; and
   c.    Common and/or anticipated remedies.

3.    Description of routine monitoring and laboratory testing:
   a.    Description of monitoring tasks;
   b.    Description of required data collection, laboratory tests and their interpretation;
   c.    Required quality assurance, and quality control;
   d.    Schedule of monitoring frequency and procedures for a petition to Illinois EPA to reduce the frequency of or discontinue monitoring; and
   e.    Description of verification sampling procedures if Cleanup or Performance Standards are exceeded in routine monitoring.

4.    Description of alternate O&M:
   a.    Should systems fail, alternate procedures to prevent releases or threatened releases of hazardous substances, pollutants or contaminants which may endanger public health and the environment or exceed performance standards; and
   b.    Analysis of vulnerability and additional resource requirement should a failure occur.

5.    Corrective Action:
   a.    Description of corrective action to be implemented in the event that cleanup or performance standards are exceeded; and
   b.    Schedule for implementing these corrective actions.

6.    Safety plan:
   a.    Description of precautions, of necessary equipment, etc., for Site personnel; and
   b.    Safety tasks required in event of systems failure.

7.    Description of equipment:
   a.    Equipment identification;
   b.    Installation of monitoring components;
   c.    Maintenance of Site equipment; and
   d.    Replacement schedule for equipment and installed components.

8.    Records and reporting mechanisms required:
   a.    Daily operating logs;
   b.    Laboratory records;
   c.    Records for operating costs;
   d.    Mechanism for reporting emergencies;
   e.    Personnel and maintenance records; and
   f.    Monthly/annual reports to State agencies.

## 7.6    Contingency Plan

The RD Contractor(s) shall prepare a Contingency Plan describing procedures to be used in the event of an accident or emergency at the Site. The Contingency Plan may be part of the HSP or a separate document. The Contingency Plan shall include at a minimum the following:

1.    Name of the person or entity responsible for responding in the event of an emergency incident;
2.    Plan and date(s) for meeting(s) with the local community, including local, State and Federal agencies involved in the RA, as well as local emergency squads and hospitals;
3.    First aid medical information; and
4.    Spill Prevention, Control, and Countermeasures ("SPCC") Plan (if applicable), as specified in 40 CFR Part 109 describing measures to prevent and contingency plans for potential spills and discharges from materials handling and transportation.

## 7.7    Performance Standard Verification Plan

The RD Contractor(s) shall prepare a Performance Standard Verification Plan describing: (i) how the performance standards included in the ROD are achieved by the RD; and (ii) the means by which these standards will be measured and verified following the RA.

## Installation and Operation of Monitoring Program for Remedial Action

The RA Contractor(s) shall implement monitoring programs to evaluate and ensure that the

construction and implementation of the RA comply with approved plan and design documents and performance standards. RA Contractor(s) shall submit monitoring programs as part of the RDWP, which shall address the specific components of the RA. Each sample shall be analyzed for a list of parameters approved by the Illinois EPA.

**Groundwater Monitoring**

The RA Contractor(s) shall implement a groundwater monitoring program as identified in the RDWP or as required by the Illinois EPA. The RA Contractor(s) shall design a groundwater monitoring program to detect changes in the chemical concentration of the groundwater under and adjacent to the Site.

**Air**

At all times during the performance of the RA, the RA Contractor(s) shall ensure that air emissions do no exceed a cumulative cancer risk at the nearest downwind residence, using risk calculations methods set for the Risk Assessment Guidance for Superfund. In addition, the air emission shall not exceed any ARARs. If air emissions exceed these levels, Settling Defendants/PRPs' Contractors shall take corrective measures as developed in the Contingency/Design Plans. Residuals from air emissions and landfill gas control processes shall be treated and/or disposed of pursuant to ARARs.

**Landfill Gas in Soils and Groundwater**

The requirements of this part follow the requirements stated above for Air and include the movement of landfill gases (e.g., VOCs, methane) through soils and groundwater. Landfill gas emissions shall not exceed specific hazardous risk levels (chemical, explosive, and oxygen displacement) pursuant to ARARs.

**Points of Compliance**

In order to monitor and evaluate the RA throughout the Site, certain locations at which there are groundwater monitoring wells shall be selected as points of compliance, pursuant to the ROD, CD, SOW, and ARARs. Wells designated as representing the Points of Compliance, and which shall be sampled will be identified in the Pre-Design/Design Work Plan. The monitoring wells will be grouped into wells for detection monitoring and wells for compliance monitoring. If any of the wells are destroyed, damaged, or in any way becomes unusable, the Settling Defendants/PRPs' Contractors shall repair or replace each well. Additional wells may be included during the development of the RDWP, RAWP, and the O&M Plan. The location of any additional wells installed pursuant to the CD or the SOW shall be approved by the Illinois EPA. Points of Compliance for the monitoring and evaluation of the landfill gas extraction and flaring shall be addressed in the O&M Plan.

## 8.0    REMEDIAL ACTION TASKS TO BE PERFORMED

The RA activities shall consist of the following tasks:

Task 1 - Contractor Procurement (PRP Activity)
Task 2 - Community Relations
Task 3 - Preconstruction Conference
Task 4 - RA Construction and Related Activities
Task 5 - Oversight of Construction Activities
Task 6 - Prefinal Construction Conference and Prefinal Inspection
Task 7 – Preliminary/Interim Closeout Report Assistance
Task 8 - Final Inspection
Task 9 - Project Closeout

## 8.1    Task 1 - Contractor Procurement (PRP Activity)

The PRPs shall complete the necessary steps and follow the appropriate procedures to procure the services of RA Contractor(s) to conduct the RA for the Site. The PRPs shall direct the RA Contractor(s) to begin planning to implement the specific activities that will need to be conducted as part of the RA.

## 8.2    Task 2 - Community Relations

The Illinois EPA will be primarily responsible for community relations activities at the Site. The community relations program will be integrated closely with all remedial response activities to ensure community understanding of the RA to take place and to obtain community input on the progress of the RA. Community relations activities for the Site may include the following:

1. Maintenance of a community information repository, which houses a copy of the administrative record;
2. Preparation and dissemination of news releases, fact sheets, slide shows, exhibits and other audio-visual materials designed to apprise the community on the progress of the RA;
3. Upkeep of a mailing list that includes nearby and interested residents, public interest groups and elected officials; and
4. Arrangement of briefings, press conferences, workshops and public and other informal meetings.

Deliverables and the schedule for submittals will be identified in the CRP.

## 8.3    Task 3 - Preconstruction Conference

After selecting the RA Contractor(s) for RA components and before implementation, the Illinois EPA shall conduct with the RA Contractor(s) a preconstruction inspection and meeting to:

1. Review methods for documenting and reporting inspection data;
2. Review methods for distributing and storing documents and reports;
3. Review work area security and safety protocol;

4.   Discuss any appropriate modifications of the approved construction quality assurance plan to ensure that Site-specific considerations are addressed;

5.   Conduct a Site walk-around to verify that design criteria, plans, and specifications are understood and to review material and equipment storage locations; and

6.   Identify and resolve potential problems with implementation of the approved design documents.

The preconstruction inspection and meeting shall be documented by the Illinois EPA and minutes shall be transmitted to all parties attending the inspection and meeting. This inspection and meeting will include the Illinois EPA's Project Manager or his or her designated representative, the PRPs' project coordinator or his or her designated representative and the RA Contractor(s).

## 8.4   Task 4 - RA Construction and Related Activities

The Settling Defendants/PRPs' Consultant(s) shall implement the RA as detailed in the approved Final Design. The following activities shall be completed in constructing the RA.

1.   A landfill gas management program;
2.   Institutional controls, access restrictions and deed restrictions;
3.   Storm water management/surface water diversion system;
4.   Closure of the leachate surface impoundment;
5.   Leachate collection and management system;
6.   Groundwater remediation and management (monitored natural attenuation); and
7.   A multi-layer landfill cap.

### 8.4.1   Administrative Documents

This subtask involves the finalization of the QAPP and HSP. The Illinois EPA shall ensure the RA-QAPP and HSP submitted with the 100% design package are updated by the RA Contractor(s) resulting in Final Construction QAPP ("CQAPP") and HSP. The Final CQAPP and Final HSP shall be submitted to the Illinois EPA for approval prior to initiation of construction activities.

### 8.4.2   Construction Activities

This subtask involves actual construction activities at the Site. The Illinois EPA shall require the RA Contractor(s) to provide a schedule and details for each construction activity (e.g., mobilization, excavation, backfilling, demolition of structures, sampling, etc.). Also, the PRPs must submit for the Illinois EPA's review and approval information on the RA Contractor(s) to be used in the RA phase of the project.

## 8.5   Task 5 - Oversight of Construction Activities

The PRPs and their RA Contractor(s) shall be directly responsible for providing day-to-day on-Site management of the Site work and other RA Contractor(s). In addition, the PRPs or their consultant(s)

shall conduct periodic on-Site inspections to observe and monitor the RA construction activities. These inspections will be done in accordance with the scope and frequency specified in the Final CQAPP. The inspections shall verify compliance with the approved plans and specifications, the Final RA Work Plan, the Final QAPP, and the Final HSP.

General duties of the PRPs and/or their consultant(s) shall include at a minimum the following:

1. interpreting the Site plans and specifications;
2. interpreting the impact on the approved design of any proposed changes and preparing sketches and/or revised drawings in a timely manner to aid in the preparation of construction contract modifications;
3. resolving design problems associated with interpretation of contract plans and specifications;
4. documenting any field decisions during construction that result in design changes;
5. overseeing Site start-up testing and shake-down; and
6. verifying compliance with all environmental requirements.

## 8.6    Task 6 - Prefinal Construction Conference and Prefinal Inspection

Upon preliminary project completion, the RA Contractor(s) shall establish with the Illinois EPA a date for conducting a prefinal construction conference and a prefinal inspection. The purpose of the prefinal construction conference will be to discuss and outline procedures and requirements for project closeout. The prefinal inspection shall consist of a walk-through inspection of the entire Site. The purpose of this inspection is to determine if the project is complete and consistent with the contract documents and the approved RA work. Any outstanding RA work discovered during the inspection shall be identified and noted. The PRPs shall prepare and submit to Illinois EPA for approval a prefinal inspection report containing the following items:

1. a punch list of incomplete construction items;
2. a description of actions required to resolve each incomplete construction item;
3. a completion date for each incomplete construction item; and
4. a tentative date for a final inspection.

## 8.7    Task 7 - Preliminary/Interim Closeout Report Assistance

After receipt of the Illinois EPA's approval on the prefinal inspection report, the RA Contractor(s) shall prepare and submit to Illinois EPA any necessary documentation and provide any related assistance for the Illinois EPA's developing a Preliminary Closeout Report ("PCOR").

## 8.8    Task 8 - Final Inspection

After completion of any work identified in the prefinal inspection report, the PRPs/RA Contractor(s) shall notify the Illinois EPA after completion of any outstanding construction items identified in the pre-final inspection for purposes of scheduling a final inspection. The final inspection shall consist

of walk-through inspection of the Site by the Illinois EPA and the PRPs or their consultant(s). The prefinal inspection report shall be used during the final inspection to confirm that all outstanding construction items have been resolved. Confirmation shall be made that outstanding items have been resolved.

**Final Construction Report**

Within 60 days of a successful final inspection, the PRPs/RA Contractor(s) shall submit a Construction Completion Report. In the report, a registered professional engineer and the PRPs' Project Coordinator shall state that the RA has been constructed in accordance with the design and specifications. The written report shall include as-built drawings signed and stamped by a professional engineer. The report shall contain the following statement, signed by a responsible corporate official of the PRP or the PRPs' Project Coordinator:

> "To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

**8.9    Task 9 - Project Closeout**

**Remedial Action Completion Report**

The PRPs/RA Contractor(s) shall submit to the Illinois EPA a RA Completion Report upon completion of all construction activities associated with the RA. This report shall document that the project was completed consistent with the design specifications and that RA work meets all performance standards and achieved all cleanup standards. In the report, a registered professional engineer and the PRPs' Project Coordinator shall state the RA has been completed in full satisfaction of the requirements of the CD. The written report shall include as-built drawings signed and stamped by a professional engineer. The report shall contain the following statement, signed by a responsible corporate official of the PRPs' Project Coordinator:

> "To the best of my knowledge, after thorough investigation, I certify that the information contained in or accompanying this submission is true, accurate and complete. I am aware there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."

The report shall include, but not be limited to the following elements:

1.    Synopsis of the RA work and certification of the design and construction;
2.    Summary of any approved modifications to the plans and specifications;
3.    Summary of the operation and maintenance to be under taken at the Site;
4.    All as-built drawings; and
5.    Data demonstrating that cleanup and Performance Standards have been met.

-35-

This report shall be prepared and certified as true and accurate by a registered professional engineer. The report shall be developed consistent with **Superfund Remedial Design and Remedial Guidance (OSWER Dir. 9355.0-4A)**.

The PRPs/RA Contractor(s) shall revise the report upon receipt of the Illinois EPA comments and submit a Final RA Report.

## 9.0 LONG-TERM O&M

The PRPs/RA Contractor(s) will perform long-term O&M as defined in approved specific O&M Plan, specifications, and schedules. The initial O&M Plan will be developed during the RD, revised as necessary during the RA, and revised further, if necessary, as determined by circumstances over time.

**Operation & Maintenance Plan**

The RA Contractor shall prepare an O&M Plan to cover both implementation and long-term maintenance and monitoring of the RA. An initial draft O&M Plan shall be submitted as a final Design Document submission. The final O&M Plan shall be submitted to the Illinois EPA prior to the pre-final construction inspection, in accordance with the approved construction schedule. The O&M Plan shall be composed of the following elements:

1.  Description of normal O&M:
    a.  Description of tasks for operation;
    b.  Description of tasks for maintenance;
    c.  Description of prescribed treatment or operation conditions; and
    d.  Schedule showing frequency of each O&M task.

2.  Description of potential operating problems:
    a.  Description and analysis of potential operation problems;
    b.  Sources of information regarding problems; and
    c.  Common and/or anticipated remedies.

3.  Description of routine monitoring and laboratory testing:
    a.  Description of monitoring tasks;
    b.  Description of required data collection, laboratory tests and their interpretation;
    c.  Required quality assurance, and quality control;
    d.  Schedule of monitoring frequency and procedures for a petition to Illinois EPA to reduce the frequency of or discontinue monitoring; and
    e.  Description of verification sampling procedures if Cleanup or Performance Standards are exceeded in routine sampling.

4.  Description of alternative O&M:

      a.     Should systems fail, alternative procedures to prevent release or threatened releases of hazardous substances, pollutants or contaminants which may endanger public health and the environment or exceed performance standards; and

      b.     Analysis of vulnerability and additional resource requirement should a failure occur.

5.     Corrective Action:

      a.     Description of corrective action to be implemented in the event that clean-up or performance standards are not met; and

      b.     Schedule for implementing these corrective actions.

6.     Safety:

      a.     Description of precautions, of necessary equipment, etc., for Site personnel; and

      b.     Safety tasks required in event of systems failure.

7.     Description of equipment:

      a.     Equipment identification;

      b.     Installation of monitoring components;

      c.     Maintenance of Site equipment; and

      d.     Replacement schedule for equipment and installed components.

8.     Records and reporting mechanisms required:

      a.     Daily operating logs;

      b.     Laboratory records;

      c.     Records for operating costs;

      d.     Mechanism for reporting emergencies;

      e.     Personnel and maintenance records; and

      f.     Monthly/annual reports to the Illinois EPA.

# APPENDIX C



7

# APPENDIX D

**EXHIBIT D**

**CASHOUT GENERATOR SETTLING DEFENDANTS**

| Cashout Generator Settling Defendant | Buyout Amount ($) |
|---|---|
| Amerock division of Newell Operating Company (sub. of Newell Rubbermaid Inc.); Apache Products Company (Apache Building Prod.); The Arnold Engineering Company; Beatrice Company; Wright & Wagner Dairy; CherryVale Shopping Center (C.V. Investments) (JG Cherryvale Ltd.) (Jacobs Realty Investors Limited Partnership) (The Richard E. Jacobs Group, Inc.) (Jacobs Group Management Co., Inc.); Cub Food Stores (SuperValu Inc., f/k/a SuperValu Stores, Inc., d/b/a Cub Foods); DaimlerChrysler Corporation (f/k/a Chrysler Corporation); Dana Corporation (Warner Electric Brake & Clutch); Dell Foods (Kerry Inc.); Enzyme Bio-Systems, Ltd.; Hilander Foods; Hormel Foods Corporation (George A. Hormel & Company); Illinois Water Treatment, Inc. n/k/a Process Water Systems, Inc.; Invensys, PLC, including its subsidiary known as Invensys Building Systems, Inc., and the entities known as Barber-Colman Co., and Siebe North, Inc. (North Health Care); Kmart Corporation (K-Mart Corporation); Logli Food Stores (Schnuck Markets, Inc., d/b/a Logli Supermarkets); Marengo Disposal; Millmaster Onyx Group, L.P.; Pepsi-Cola General Bottlers, Inc.; Ponderosa Steak House (Metromedia Restaurant Group) (Metromedia Steakhouses Company, LP); Seneca Foods Corporation; Simon Property Group, L.P. on its own behalf and for Simon Property Group (Illinois), L.P.; Sonoco Products Company; Stateline Foundries (State Line Foundries, Inc.); Sugar Tree Products (International Ingredient Corp. f/k/a Sugar Tree Products); Taylor Freezer Company (Carrier Commercial Refrigeration, Inc.) (Beatrice Company); Textron Inc.; Camcar; Greenlee Tool; Ex-Cell-O Manufacturing; Sems Corporation; Twin Disc, Incorporated; Universal Foods Corporation (n/k/a Sensient Technologies Corporation); Valspar Corporation (McWhorter Inc.); Varco-Pruden (SPX Corporation, f/k/a United Dominion Industries, Inc., d/b/a Varco-Pruden); Warner-Lambert Company, a wholly-owned subsidiary of Pfizer Inc.; Wisconsin Power and Light Company (an Alliant Energy company); W.R. Meadows, Inc. | 6,978,139 |
| United Technologies Corporation | 149,680 |
| Ecolab, Inc. | 117,155 |
| UDL Laboratories, Inc. | 113,730 |
| Continental Envelope Corp. | 108,043 |
| Atwood Mobile Products | 92,420 |
| Chemtura Corporation | 86,270 |
| Eclipse, Inc. | 76,615 |
| Atwood CTP, Inc. | 70,000 |

| Cashout Generator Settling Defendant | Buyout Amount ($) |
|---|---|
| Beloit Memorial Hospital | 67,408 |
| Benson Pump Company | 64,013 |
| Hondo, Inc., d/b/a Coca-Cola Bottling Co., Inc. | 59,950 |
| J.W.L. Plaza d/b/a Elgin West Truck Stop | 55,760 |
| Wisconsin Knife Works, Inc. | 51,680 |
| Toys R Us | 48,530 |
| D&M Plastics Corp. | 45,800 |
| Rockford Systems, Inc. | 43,710 |
| Pierce Biotechnology, Inc. | 39,290 |
| Control Panels, Inc. | 38,930 |
| Bodycote Thermal Processing, Inc. | 37,810 |
| Nelson Piping Co. | 37,650 |
| Earl Scheib, Inc. | 35,910 |
| Pacific Scientific Co. | 35,560 |
| Peterson Kruse, Inc. | 32,950 |
| Tamms Industries | 32,680 |
| The Sherwin-Williams Co. | 31,825 |
| Material Service Corporation, a General Dynamics Corporation | 30,860 |
| The Goodyear Tire & Rubber Co. | 30,590 |
| North American Tool Corp. | 29,270 |
| Crescent Electric Supply Co. | 29,160 |
| Reliable Machine Co. | 29,155 |
| Dixon Automatic Tool, Inc. | 28,000 |
| Anderson Packaging, Inc. | 25,000 |
| Rockford Ball Screw Co. | 25,000 |
| Sjostrom & Sons, Inc. | 20,000 |
| Three Hammer Construction Co. | 20,000 |
| Mid-States Concrete Products Co. | 20,000 |
| The Gates Corporation | 16,181 |
| Jonco Tool, Inc. | 15,000 |

| Cashout Generator Settling Defendant | Buyout Amount ($) |
|---|---|
| Tang Industries, Inc., on behalf of Wilmar Processing and Beloit Power Systems | 0 |

# APPENDIX E

## APPENDIX E

### OWNER SETTLING DEFENDANTS

The term "Owner Settling Defendants" means Raymond E. DeWane, Audrey DeWane, Benjamin Farina and Jean Farina, in whatever legal capacity, including, but not limited to, as individuals, as partners of the Bonus Landfill Company, or as beneficiaries of land trusts, and their respective heirs, beneficiaries, successors, assigns, agents, representatives and insurers; and LAE, Inc., an Illinois corporation, its successors, assigns and insurers, and its present and former officers, shareholders, directors, employees and representatives.

# APPENDIX F

## EXHIBIT F

## MUNICIPAL SETTLING DEFENDANTS

| Municipal Settling Defendant | Buyout Amount ($) |
|---|---|
| City of Beloit, Wisconsin | 300,000 |
| Rockford School District No. 205, Winnebago-Boone Counties, Illinois | 93,000 |
| City of Evansville, Wisconsin | 45,000 |
| Village of Rockton, Illinois | 35,000 |
| Village of Hampshire, Illinois | 35,000 |
| City of South Beloit, Illinois | 30,000 |
| Village of Orfordville, Wisconsin | 30,000 |
| Village of Roscoe, Illinois | 25,000 |
| City of Rockford, Illinois, a Municipal Corporation (including Rockford Public Library); Rockford Housing Authority; Rock River Water Reclamation District | 25,000 |
| City of Genoa, Illinois | 23,000 |
| Village of Footville, Wisconsin | 19,800 |
| City of Harvard, Illinois | 15,000 |
| Village of Machesney Park, Illinois | 10,000 |
| Vilage of Kingston, Illinois | 5,000 |

# APPENDIX G

**MIG/DEWANE LANDFILL SUPERFUND SITE**

**IRS 468B QUALIFIED SETTLEMENT TRUST FUND AGREEMENT**

APPENDIX G TO

MIG/DEWANE LANDFILL SITE

REMEDIAL DESIGN/REMEDIAL ACTION CONSENT DECREE

# IRS 468B QUALIFIED SETTLEMENT MIG/DEWANE LANDFILL SUPERFUND SITE TRUST FUND AGREEMENT

## TABLE OF CONTENTS

1.    Definitions ................................................................................4

2.    Name, Purpose of the Trust and Acceptance of the Trust ........................................6

3.    Contributions to the Trust Funds ........................................................7
3.1.  Initial Payments by Grantors ...........................................................7
3.2.  Nature of Contributions by Grantors .....................................................8
3.3.  No Transferability of Interest .........................................................8

4.    Dispositive Provisions ..................................................................8
4.1.  Payment of Income and Principal .........................................................8
4.2.  No Authority to Conduct Business ........................................................9
4.3.  Termination of the Trust Funds .........................................................9
4.4.  Distribution of Trust Funds Upon Termination ...........................................9
4.5.  Alterations, Amendments and Revocation .................................................9
4.6.  Grantors' Instructions to Trustee .....................................................10

5.    Trustee Management .....................................................................10

6.    Express Powers of Trustee .............................................................11
6.1.  Payment of Expenses of Administration .................................................11
6.2.  Preservation of Principal ............................................................11
6.3.  Retention of Investment Advisor and Other Consultants .................................11
6.4.  Execution of Documents of Transfer ...................................................11
6.5.  Extension of Obligations and Negotiations of Claims ..................................11
6.6.  Litigation ...........................................................................12
6.7.  Execution of Contracts and Agreements ................................................12
6.8.  Discretion in Exercise of Powers .....................................................12

7.    Advice of Counsel .....................................................................13

8.    Trustee Compensation ..................................................................13

9.    Successor Trustees ....................................................................13
9.1.  Vacancy Caused by Resignation or Removal ..............................................13
9.2.  Appointment of Successor Trustees .....................................................13
9.3.  Acceptance of Appointment by Successor Trustees .......................................14

2

9.4.    **Preservation of Record of Changes to Trustees** ........................................................14

10.    **Instructions to the Trustee** ........................................................14
10.1.    **Reports**........................................................14
10.2.    **Annual Statement and Tax Returns** ........................................................14
10.3.    **Counsel** ........................................................15
10.4.    **Records** ........................................................15

11.    **Indemnity**........................................................15
11.1.    **Indemnity** ........................................................15
11.2.    **Survival**........................................................16

12.    **Interests Not Assignable or Subject to Claims of Creditors** ...................................16

13.    **Written Instructions to Trustee** ........................................................16

14.    **Choice of Law** ........................................................16

15.    **Interpretation** ........................................................17

16.    **Separate Documents** ........................................................17

17.    **Notices**........................................................17

18.    **Response Action Contractor** ........................................................19

19.    **Successor Trustee** ........................................................19

20.    **Assignment of Interests** ........................................................19

21.    **Attachment of Escrow Fund: Compliance with Legal Consent Decrees**.................19

22.    **Conflicting Demands** ........................................................20

## MIG/DEWANE LANDFILL SUPERFUND SITE
## TRUST FUND AGREEMENT

This Trust Fund Agreement ("Agreement") dated     , 2005, by and between the entities whose authorized representatives have executed this Agreement (the "Grantors") and the _____ Bank, not personally but solely as Trustee hereunder, (the "Trustee"):

3

## RECITALS

WHEREAS, without admitting any liability, the Grantors have entered into a Consent Decree with the State of Illinois captioned People of the State of Illinois vs. BFI Waste Systems of North America, Inc., et al., No. _____, RD/RA CONSENT DECREE (the "Consent Decree") in which the Grantors have agreed to reimburse the State of Illinois for environmental response costs incurred and to be incurred at the MIG/DeWane Landfill Superfund Site in Belvidere, Boone County, Illinois (the "Site"), and/or to finance certain future work at the Site ("RD/RA Work");

WHEREAS, the Grantors wish to establish two trust funds, the MIG/DeWane RD/RA Construction Trust Fund and the MIG/DeWane RD/RA O&M Trust Fund which shall partially satisfy the financial assurance requirements of the Consent Decree and shall facilitate payments for a portion of the future RD/RA Work required under the Consent Decree;

Whereas, pursuant to the Consent Decree, BFINA shall perform the Work and may use the funds from the Trust Funds to pay for a portion of that Work pursuant to the Consent Decree and as allowed pursuant to this Trust Agreement;

NOW, THEREFORE, the Trustee hereby agrees that it will hold, invest and reinvest the funds contributed to the MIG/DeWane RD/RA Construction Trust Fund and the MIG/DeWane RD/RA O&M Trust Fund and any income earned thereon, consistent with this Agreement together with any other property hereafter conveyed, assigned, transferred or paid to it, as Trustee, in trust, subject to the terms, provisions and conditions set forth herein.

1.    **DEFINITIONS**

As used in this Agreement:

1.2.    The term **"Consent Decree"** shall mean the Consent Decree that the Grantors have entered into with the State of Illinois captioned People of the State of Illinois vs. BFI Waste Systems of North America, et al., No. _____, a copy of which has been or will be provided to the Trustee;

1.3.    The term **"Trust Funds"** shall mean the two trust funds established pursuant to this Agreement to satisfy the requirements of the Consent Decree that an RD/RA

4

Construction Trust Fund and an RD/RA O&M Trust Fund be established and funded by settlement funds from the Large Volume Settling Defendants to pay a portion of future RD/RA Work, and to the extent allowed, to comply with Section 468B of the Internal Revenue Code and the Treasury Regulations promulgated thereunder;

1.4. The term "**Grantors**" shall mean certain Cashout Generator Settling Defendants as defined in the Consent Decree whose authorized representatives have executed this Agreement and the Consent Decree.

1.5. The term "**Trustee**" shall mean LaSalle Bank National Association, its corporate successors and any successor or successors to such Trustee appointed in the future, but in no event shall any such Trustee or successor Trustee be a "related person" as defined in Treas. Reg. § 1.468B-1(d)(2).

1.6. The term "**Contractor**" for purposes of the work to be performed under the Consent Decree shall mean a qualified person or entity selected and engaged by BFINA, or in the event of a work takeover by the State of Illinois pursuant to the Consent Decree, the Illinois EPA for the purpose of completing the RD/RA Work required by the Consent Decree;

1.7. The term "**BFINA**" shall mean BFI Waste Systems of North America, Inc.

1.8. The term "**Cashout Generator Settling Defendants**" shall mean those parties who have funded the Trust Funds and who have also signed the Consent Decree.

1.9. The term "**RD/RA Work**" shall mean the future work at the Site required by the Consent Decree.

1.10. The term "**RD/RA Construction Trust Fund**" shall mean that trust fund established pursuant to this Agreement by the deposit of $6,228,139.00 by the Grantors and which funds shall be used exclusively for the funding of Remedial Action as defined in the Consent Decree.

1.11. The term "**RD/RA O&M Trust Fund**" shall mean that trust fund established pursuant to this Agreement by the deposit of $750,000.00 by the Grantors and

5

which funds shall be used exclusively for the funding of long term Operation and Maintenance of the Remedial Action as defined in the Consent Decree, and which funds may be expended only after issuance by Illinois EPA of the Certification of Completion of Remedial Action, a copy of which will be provided to the Trustee.

1.12.   All other capitalized terms in this Agreement shall have the meanings defined in the Consent Decree unless specifically defined herein.

## 2.   NAME, PURPOSE OF THE TRUST AND ACCEPTANCE OF THE TRUSTS

2.1.   This Trust shall be known as the MIG/DeWane Landfill Superfund Site RD/RA Trust (the "RD/RA Trust") that allows the establishment of the Trust Funds as that term is defined in the Consent Decree. The purpose of the Trust is to obtain, hold, invest and disburse funds, and income earned thereon, as directed by the Grantors so that the Grantors may satisfy their obligations pursuant to the Consent Decree. The Grantors intend, to the extent this Trust may reasonably qualify, for this Trust to be classified as a Qualified Settlement Fund within the meaning of Section 468B of the Internal Revenue Code, 26 U.S.C. § 1.468B-1, et. seq. It is further intended that this Trust shall be taxed on its modified gross income, which will not include the sums transferred to it from any Grantor. In computing this Trust's modified gross income, deductions will be allowed for, inter alia, administrative costs and other incidental deductible expenses incurred in connection with the operation of this Trust, including without limitation, state and local taxes, legal, accounting, and actuarial fees relating to operation of this Trust.

2.2.   The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Agreement and no implied covenants or obligations should be read into the Agreement against the Trustee.

2.3.   The Trustee may execute any of the trusts and perform any of its duties by or through attorneys, agents, receivers or employees, shall be responsible for the conduct of same in accordance with the standards set forth in Section 2.5 below, and shall be entitled to the advice of counsel concerning all matters of the trusts hereof and the duties hereunder, and may in all cases pay such reasonable compensation to any such attorneys, agents, receivers or employees as may

6

reasonably be employed in connection with the trusts hereof. The Trustee may act upon the opinion or advice of any attorney (who may be the attorney or attorneys for the Grantors) approved by the Trustee after providing notice to the Grantors of its intent to solicit such opinion or advice in the exercise of reasonable care. The Trustee shall not be responsible for any loss or damage resulting from any action or non-action in good faith reliance upon such opinion or advice.

2.4. The Trustee may act upon any notice, request, consent, certificate, Consent Decree, affidavit, letter, e-mail message or other paper or document believed to be genuine and correct, and to have been signed or sent by the proper person or persons based upon written notification to the Trustee by the Grantors or the person or persons authorized by the Grantors to request actions by the Trustee.

2.5. The permissive right of the Trustee to do things enumerated in this Agreement shall not be construed as a duty, and the Trustee shall not be answerable for other than its negligence, gross negligence or willful misconduct or that of its attorneys, agents, receivers or employees.

2.6. The Grantors acknowledge and agree that the Trustee does not make any representations, warranties or covenants regarding compliance of the Trust Funds or this Agreement, or any of the Trustee's acts or omissions, with Section 468 of the Internal Revenue Code or the Treasury Regulations promulgated thereunder.

3. **CONTRIBUTIONS TO THE TRUST FUNDS**

3.1. **Initial Payment by Grantors.** The Grantors will contribute to the Trust Funds within thirty (30) days of the effective date of the Consent Decree by collectively causing to be deposited into the RD/RA Construction Trust Fund the amount of $6,228,139.00 and into the RD/RA O&M Trust Fund the amount of $750,000.00. The Trustee will provide notice of each payment into the Trust to all other Grantors and to the Illinois EPA within 30 days of the Trustee's receipt of such payment. The Grantors shall have no funding obligations beyond the initial funding in the amount of a collective total of $6,978,139.00 as specified in 3.1 above.

7

3.2. **Nature of Contributions by Grantors.** All contributions to the Trust Funds shall be made in immediately available funds. All such contributions, together with the earnings thereon, shall be held as a trust fund for payment of a portion of the future Work required under the Consent Decree. Contributions made to the Trust Funds shall not be construed as fines, penalties or monetary sanctions.

3.3. **No Transferability of Interest.** The interest of the Grantors, and their obligation to provide funds under this section, is not transferable, except to a successor corporation or corporations, and any such transferee corporation shall assume the obligations of the transferring Grantor(s) by executing such documents as the Trustee may require.

4. **DISPOSITIVE PROVISIONS**

4.1. **Payment of Income and Principal.** During the term of this Agreement, and to the extent of the funds remaining in the Trust Funds, the Trustee shall, on behalf of the Grantors, pay all invoices that BFINA submits to the Trustee that include BFINA's validly executed Payment Authorization, in the form attached as Exhibits A or B attached hereto, for payments from the RD/RA Construction Trust Fund and from the RD/RA O&M Trust Fund respectively, that the invoice was incurred in compliance with the requirements of the Consent Decree. The Grantors may review all payments made by the Trustee. Such right to review shall not, however, be interpreted as creating a right on the part of Grantors to object or to direct the Trustee not to make a related payment. If the Grantors believe that such payments were made for work that is not consistent with the Work being done pursuant to the Consent Decree, the Grantors may petition the Court that retains jurisdiction over the Consent Decree for an Order requiring that BFINA reimburse the Trust Fund from which the payments were made the full amount of the payments. Upon receipt by the Trustee of a certified copy of a final Illinois EPA demand for the remaining Trust Funds that includes a notice of the conclusion of any and all dispute resolution procedures invoked by BFINA under the Consent Decree based on the IEPA's determination that BFINA has ceased implementation of any portion of the RD/RA portion of the Work pursuant to Paragraph 138 of the Consent Decree and that Illinois EPA is taking over

8

performance of the Work pursuant to the Consent Decree, the Trustee shall disburse the remaining funds in the Trust Funds to the Illinois EPA after payment of any outstanding Trustee Compensation pursuant to Paragraph 8, by remitting the funds to the address and account number specified in Section XVI of the Consent Decree, with a copy to BFINA and to the Grantors.

4.2.    **No Authority to Conduct Business.**  This Agreement shall not be construed to confer upon the Trustee any authority to carry on any business or activity for profit; provided, however, that the Trustee may invest the Trust Funds and to perform its other duties in accordance with this Agreement.

4.3.    **Termination of the Trust Agreement.**  This Trust Agreement shall terminate upon the occurrence of one or more of the following: (a) termination of the Consent Decree; or (b) distribution of all of the Trust Funds pursuant to Sections 4.4 or 4.1.

4.4.    **Distribution of Trust Funds Upon Termination.**  Before the trust created hereby may be deemed terminated, the trustee shall have distributed any remaining balance in the Trust Funds, after payment of the Trustee's fees, costs and expenses, to the Illinois EPA as specified in Section XVI of the Consent Decree, with a copy to BFINA and to the Grantors.

4.5.    **Alterations, Amendments and Revocation.**  This Trust may be altered, amended, or revoked by a written instrument executed by an authorized representative(s) of the Grantors provided, however, that no such alteration, amendment or revocation may conflict with or modify in any respect the Grantors' obligations under the Consent Decree, and provided further that: (a) Section 12 hereof shall not be revoked and shall not be altered or amended to limit the effect thereof with respect to acts or omissions taken or made up to thirty (30) days after such alteration or amendment; and (b) no such alteration, amendment or revocation is adverse to the interests of the Trustee. The Trustee shall have no duty to determine whether the conditions for alteration, amendment or revocation have been satisfied, but instead shall be entitled to rely upon the signatures of the Grantors on the instrument.

9

**4.6** **Grantors' Instructions to Trustee.** The authorized representatives of Grantors Pfizer Inc., DaimlerChrysler Corporation and UTC are authorized to instruct the Trustee on behalf of all of the Grantors for any action the Grantors are authorized to take under this Agreement. The Trustee may rely upon any written instructions duly signed by all three of the authorized representatives of those three Grantors to take any action to effectuate the purpose of this Agreement and to exercise the powers specifically conferred upon it by this Agreement. However, the Grantor's authorized representatives may not instruct the Trustee not to pay invoices submitted by BFINA that include BFINA's validly executed Payment Authorization pursuant to Paragraph 4.1. The preceding sentence shall in no way limit he right of the Grantors to petition the Court for an Order requiring BFINA to reimburse the applicable Trust Fund the full amount of any such payments, as provided by Paragraph 4.1

## 5. TRUSTEE MANAGEMENT

The Trustee shall invest and reinvest the principal and income of the Trust Funds and keep the Trust Funds invested in Federated Treasury Obligations (Trust Shares) Fund, or such other investment fund as the Grantors after consultation with BFINA may instruct the Trustee in writing so long as the selected investment fund is located in the United States or guaranteed by agencies of the United States, and treated as a single fund without distinction between principal and income and so long as the Trustee is capable of investing in such funds on an automated basis. All investments shall be made so as to at all times provide sufficient liquidity to meet the anticipated cash needs of the Trust Funds. The Trustee, with the prior approval of the Grantors after consultation with BFINA, may engage the services of an investment advisor or manager, may rely on the advice of such advisor or manager, and may delegate investment decision-making authority to such advisor or manager with respect to management of the Trust Funds. The Trustee shall not be personally liable for any action or inaction taken in good faith reliance on the advice of such advisor or manager, nor for delegation in good faith of investment decision-making authority to such advisor or manager. The Trustee shall keep or arrange to be kept an accounting of all contributions to and disbursements from the Trust Funds.

6.  **EXPRESS POWERS OF TRUSTEE**

Without in any way limiting the power and discretion conferred upon the Trustee by the other provisions of this Agreement or by law, the Trustee is expressly authorized and empowered as follows:

6.1.  **Payment of Expenses of Administration.** To incur and pay any and all charges, taxes and expenses connected with the Trust Funds in the discharge of its fiduciary obligations under this Agreement. All such payments shall be made using the assets of the Trust Funds.

6.2.  **Preservation of Principal.** Notwithstanding any other provision in this Agreement, to at all times hold, manage, invest and reinvest the assets of the Trust Funds in a manner designed to preserve the accrued income and principal of the Trust Funds for the purposes of the Trust Funds.

6.3.  **Retention of Investment Advisor and Other Consultants.** With the prior approval of the Grantors, and pursuant to Section 14, to engage the services of (and pay compensation to) an investment advisor, accountants, agents, managers, legal counsel, or other consultants with respect to the management of investments of the Trust Funds, the management of the Trust Funds, or any other matters. However, the Grantor's authorized representatives may not instruct the Trustee not to pay invoices submitted by BFINA that include BFINA's validly executed Payment Authorization pursuant to Paragraph 4.1. The preceding sentence shall in no way limit the right of the Grantors to petition the Court for an Order requiring BFINA to reimburse the applicable Trust Fund the full amount of any such payments, as provided by Paragraph 4.1.

6.4.  **Execution of Documents of Transfer.** To make, execute, acknowledge and deliver any and all documents of transfer and conveyance and any and all other instruments that may be necessary or appropriate to carry out the powers herein granted.

6.5.  **Litigation.** At the direction of the Grantors pursuant to Sections 4.6 and 13 and of BFINA and upon receipt of any indemnity the Trustee may require, the Trustee

11

agrees to be named as a party to litigation in the name of the Trust Funds on behalf of or in the name of some or all of the Grantors.

**6.7.** **Discretion in Exercise of Powers.** To do any other acts that it deems proper to effectuate the purpose of this Agreement and to exercise the powers specifically conferred upon it by this Agreement.

## 7.   ADVICE OF COUNSEL

The Trustee may from time to time retain experts or counsel, who shall not be counsel to any of the Grantors or BFINA, with respect to any question arising from this Agreement. The reasonable costs of any such expert and counsel shall be paid from the Trust Funds or as otherwise provided in Section 9 provided that both the Grantors and BFINA were provided notice of the intent to engage such expert or counsel, together with such information on fees and rates as it may reasonably request. The Trustee shall be fully protected, to the extent permitted by law, in acting in reliance upon the advice of counsel.

## 8.   TRUSTEE COMPENSATION

The Trustee shall be compensated for all of the services provided under this Agreement and reimbursed for its costs, in accordance with the schedule of fees and costs in effect on the effective date of this Agreement and as provided to the Grantors or as otherwise modified by agreement of the Trustee, the Grantors and BFINA during the period over which its services are performed. The Trustee may withdraw from the trust fund such fees and costs from the Trust Funds. The Trustee's schedule of fees and expenses is attached hereto as Exhibit C.

## 9.   SUCCESSOR TRUSTEES

**9.1.** **Vacancy Caused by Resignation or Removal.** The Trustee may resign at any time by delivering a resignation to the Grantors and BFINA. The Grantors, after consulting with BFINA may remove any Trustee by delivering notice of such removal in writing to such Trustee. Any such resignation or removal shall take effect within thirty (30) days of delivery of the notice of resignation or removal but no sooner than upon the acceptance of an appointment, in writing, by a successor Trustee.

12

9.2. **Appointment of Successor Trustees.** Any vacancy in the office of Trustee created by dissolution, resignation or removal by the Grantors shall be filled by the Grantors, after consulting with BFINA, by an appointment in writing of a successor Trustee. In no event shall any successor trustee appointed hereunder be a "related person" as defined in Treasury Regulation Section 1.468B-1(d)(2).

9.3. **Acceptance of Appointment by Successor Trustees.** Acceptance of appointment as a successor Trustee shall be in writing and shall become effective upon receipt by the Grantors and BFINA of notice of such acceptance. Upon the acceptance of appointment of any successor Trustee, title to the Trust Funds shall thereupon be vested in said successor Trustee, without the necessity of any conveyance or instrument. Each successor Trustee shall have all the rights, powers, duties, authority, and privileges as if initially named as a Trustee in this Agreement.

9.4. **Preservation of Record of Changes to Trustees.** A copy of each instrument of resignation, removal, appointment and acceptance of appointment shall be attached to an executed counterpart of this Agreement in the custody of the Grantors.

10. **INSTRUCTIONS TO THE TRUSTEE**

Notwithstanding anything herein to the contrary, the Trustee is hereby directed to do the following in addition to other duties set forth in other provisions of this Agreement:

10.1. **Reports.** Have prepared monthly financial reports during the term of the RD/RA Trust, describing the manner in which all of the assets of the Trust Funds are then invested and the current market value of such assets, as well as the obligations, income, and expenses of the Trust Funds. Copies of such reports shall be transmitted by the Trustee in writing to BFINA, to the Grantors and to Illinois EPA.

10.2. **Annual Statement and Tax Returns.** In accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1), the Trustee shall have prepared annual financial statements during the term of the Trust, describing the manner in

13

which all of the assets of the Trust Funds are then invested and the current market value of such assets, as well as the obligations, income and expenses of the Trust Funds. All financial statements shall be prepared on an accrual basis, and shall be in accordance with accounting practices generally applicable to corporate trustees, applied on a consistent basis. The Trustee shall prepare and file such tax returns as shall be required by applicable law and as directed by the Grantors and in accordance with the provisions of Treasury Regulation Section 1.468B-2(k)(1). Copies of such annual statements and tax returns shall be transmitted by the Trustee in writing to BFINA, to the Grantors and to Illinois EPA. In accordance with Treasury Regulation Section 1.468B-2(j) the taxable year of this Trust shall be the calendar year.

**10.3.  Counsel.** Advise, consult and confer with and otherwise inform the Grantors and BFINA upon any request by either the Grantors or BFINA with respect to matters arising out of this Agreement, administration of the Trust Funds, or any other matter which the Trustee, in its discretion, deems appropriate to bring to the attention of the Grantors and BFINA.

**10.4.  Records.** Maintain records of all actions taken by the Trustee with respect to matters arising out of this Agreement or administration of the Trust Funds. Copies of said records shall be provided to the Grantors and BFINA, upon request, and upon termination of the Trust Funds, said records shall be transmitted, together with all other records of the Trustee, to the Grantors and BFINA. The Trustee shall have the right to assume, in the absence of written notice to the contrary, that no event constituting a change or a termination of the authority of Grantors, solely in respect to the submission of invoices for payment, has occurred.

## 11.  **INDEMNITY**

**11.1.  Indemnity.** Each Trustee, whether initially named or appointed as a successor Trustee, acts as a Trustee only and not personally; and in respect of any contract, obligation or liability made or incurred by the Trustee, or any of them hereunder in good faith, all persons shall look solely to the Trust Funds and not the Trustee personally or the Grantors. Neither the Trustee nor the Grantors shall incur any liability, personal or corporate, of any nature in connection with any act or

14

omission, made in good faith, of the Trustee or the Grantors in the administration of the Trust Funds or otherwise pursuant to this Agreement. The Trustee initially named, appointed as successor Trustee by the Grantors (after consultation with BFINA) or appointed by a court, shall be indemnified and held harmless by the Trust Funds, and, to the extent that indemnification cannot be obtained from the Trust Funds, jointly and severally by the Grantors and BFINA, for any loss, cost, expense, damage, claim, cause of action, Consent Decree or direction of any regulatory agency, any attorneys' fees, accountants' fees, expert witness fees and costs arising out of or pertaining to (a) the Site, (b) this Agreement, (c) any contracts, agreements or obligations entered into or incurred by the Trust Funds, (d) any acts or omissions of the Trustee in carrying out, or in good faith believing such acts or omissions were carrying out, this Agreement, (e) any personal injuries or property damage arising out of the Site or the Work, and (f) any response, removal or remedial costs at the Site. This indemnification shall apply to any liabilities arising from occurrences both before and after the date of this Agreement. This indemnification and hold harmless provision shall cover all expenses reasonably incurred by such Trustee in defense or settlement of the aforementioned acts or omissions of the Trustee or the Grantors. Except for the payment of all expenses reasonably incurred, this indemnification shall not apply to any liability arising from a criminal proceeding where the Trustee's conduct in question was, or is alleged to be, unlawful.

**11.2. Survival.** This section shall survive the termination of this Agreement and the Trust Funds and the resignation or removal of the Trustee.

## 12. INTERESTS NOT ASSIGNABLE OR SUBJECT TO CLAIMS OF CREDITORS

The interest of any Grantors in the Trust Funds shall not be subject to anticipation or assignment nor subject to the claims of any creditor of any Grantors.

## 13. WRITTEN INSTRUCTIONS TO TRUSTEE

Any directions for actions to be taken by the Trustee on behalf of the Grantors pursuant to this Agreement shall be given to the Trustee in writing by the Grantors subject to the provisions of Section 4.4 above.

14. **CHOICE OF LAW**

This Agreement shall be administered, construed, and enforced according to the laws of the State of Illinois except to the extent that federal law shall apply to questions arising under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., or the National Contingency Plan, 40 C.F.R. Part 300, promulgated thereunder.

15. **INTERPRETATION**

As used in this Agreement, words in the singular include the plural and words in the plural include the singular and the masculine and neuter genders shall be deemed to include the masculine, feminine and neuter. The description heading for each Section and Subsection of this Agreement shall not affect the interpretation or the legal efficacy of this Agreement. It is agreed that neither the act of entering into this Agreement nor any contribution to the Trust Funds nor any action taken under this Agreement shall be deemed to constitute an admission of any liability or fault on the part of the Trustee or the Grantors with respect to the Site or otherwise, nor does it constitute a commitment or agreement, either express or implied, by any or all of them to undertake any further activities outside the scope of this Agreement.

16. **SEPARATE DOCUMENTS**

This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

17. **NOTICES**

Notices under this Agreement shall be deemed received when sent by and/or received by the Trustee in accordance with this Section 17. Notices shall be (a) sent registered mail, return receipt requested, (b) by facsimile, (c) by a nationally recognized overnight courier, or (d) by messenger delivery. Copies of notices to the Trustee shall be delivered to the Grantors' designated agents to the following address:

Notices to the Grantors shall be sent to:

16

John L. Greenthal
Nixon Peabody LLP
Omni Plaza
30 South Pearl Street
Albany, NY 12207
Phone (518) 427-2670
Fax (518) 427-2666
E-Mail: JGreenthal@nixonpeabody.com; and

Steven C. Kohl Esq. (Steve)
Howard & Howard Attorneys PC
The Pinehurst Office Center
39400 Woodward Avenue, Suite 101
Bloomfield Hills, MI 48304-5151
Phone (248) 723-0320 (Direct)
E-Mail: skohl@howardandhoward.com; and

Kathleen McFadden
United Technologies Corporation
Office of the General Counsel
One Financial Plaza, M/S 524-Legal
Hartford, CT 06102
Phone (860) 728-7895 (Direct)
E-Mail: kathleen.mcfadden@utc.com;


and for BFINA to:

Gary D. Justis
Lathrop & Gage L.C.
10851 Mastin Blvd., Suite 1000
Overland Park, Kansas 66210
913/451-5144
913/451-0875 Fax
E-Mail: gjustis@lathropgage.com; and

Eric Ballenger
BFINA's Project Coordinator
Allied Waste Industries, Inc.
26 W. 580 Schick Road
Hanover Park, IL 60133;

17

and for the State of Illinois to:

and for the Trustee:

LaSalle Bank National Association
Corporate Trust Department
135 South LaSalle Street, Suite 1960
Chicago, IL 60603
Attention:       Anthony Veloz
Telephone:       (312) 904-2931
Fax:       (312) 904-2236

## 18.   RESPONSE ACTION CONTRACTOR

For the purposes of 42 U.S.C. §§ 9619(a) & (e), the Trustee under this Agreement is a response action contractor. The Grantors represent that the Trustee is providing services to the Grantors that relate to a response action being performed pursuant to 42 U.S.C. §§ 9606 or 9622.

## 19.   SUCCESSOR TRUSTEE

Any corporation or association into which the Trustee may be converted or merged, or with which it may be consolidated, or to which it may sell or transfer its corporate trust business and assets as a whole or in part, or any corporation or association resulting from any such conversion, sale, merger, consolidation or transfer to which it is a party, shall be and become the successor Trustee hereunder and vested with all of the title to the whole property or trust estate and all of the trusts, powers, immunities, privileges, protections and all other matters as was its predecessor, without the execution or filing of any instrument or any further act, deed or conveyance on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that if, within one hundred eighty (180) days following any such conversion, sale, merger, consolidation or

18

transfer, the Grantors after consultation with BFINA shall remove the Trustee and appoint another qualified financial institution to serve as Trustee hereunder, neither the RD/RA Trust nor any Grantors or BFINA shall have any liability or obligations to such prior Trustee other than for payment of such prior Trustee's fees and charges, prorated as may be appropriate, through the date on which such removal is effective.

## 20. ASSIGNMENT OF INTERESTS

No assignment of the interest of any of the parties hereto shall be binding upon the Trustee unless and until written evidence of such assignment in form satisfactory to the Trustee shall be filed with and accepted by the Trustee.

## 21. ATTACHMENT OF TRUST FUNDS: COMPLIANCE WITH LEGAL CONSENT DECREES

In the event the Trust Funds are attached, garnished, or levied upon by any writ, court Consent Decree or decree, the Trustee is hereby expressly authorized, in its sole discretion, to obey and comply with all writs, Consent Decrees or decrees so entered or issued, which it is advised by legal counsel of its own choosing is binding upon it, whether with or without jurisdiction, and in the event that the Trustee obeys or complies with any such writ, Consent Decree or decree it shall not be liable to any of the parties hereto or to any other person, firm or corporation by reason of such compliance notwithstanding that such writ, Consent Decree or decree is subsequently reversed, modified, annulled, set aside or vacated.

## 22. CONFLICTING DEMANDS

In the event that conflicting demands are made upon the Trustee for any situation not addressed in this Agreement, the Trustee may withhold performance of the terms of this Agreement until such time as said conflicting demands shall have been withdrawn or the rights of the respective parties shall have been settled by court adjudication, arbitration, joint Consent Decree or otherwise.

19

**WITNESS** the execution hereof of the Trustee as of the date first above written.

_____, **not personally but solely as Trustee of the MIG/DeWane Landfill Superfund Site Trust**

**By:** _____

**Its:** _____

**WITNESS** the execution hereof of the Grantors designated below as of the date first above written.

Entity: _____

By: _____

Printed Name: _____

Title: _____

Company: _____

FEIN No. _____

Contact Person for Notices:

Name: _____

Company: _____

Address: _____
_____
_____
_____
_____

Phone No. _____

Fax No.      _____

E-mail:      _____

EXHIBIT C

## SCHEDULE OF TRUSTEE'S FEES AND EXPENSES

| | |
|---|---|
| **Annual Charge** | $2,000.00/funded Trust Fund* |
| **Acceptance/Setup Charge** | waived |

\*As long as both the Construction and O&M accounts are funded, the annual fee will be $4,000; once the RD/RA Construction Fund is closed, the annual fee will be $2,000 as long as the RD/RA O&M is active and funded.

The costs of producing annual tax returns are included within the above annual charge. Any other out-of-pocket expenses, or extraordinary fees or expenses such as attorney's fees or messenger cost's, are additional and are not included in the above schedule. The annual fee is billed in advance and payable prior to that year's service. Trustee may withdraw such charges from deposited Trust Funds without prior notice to Grantors or BFINA.

Shareholder Servicing Payments: Escrow Agent may receive Shareholder Servicing Payments as compensation for providing certain services for the benefit of the Money Market Fund Company. Shareholder Services typically provided by LaSalle include the maintenance of shareholder ownership records, distributing prospectuses and other shareholder information materials to investors and handling proxy-voting materials. Typically Shareholder Servicing payments are paid under a Money Market Fund's 12b-1 distribution plan and impact the investment performance of the Fund by the amount of the fee. The shareholder servicing fee payable from any money market fund is detailed in the Fund's prospectus that will be provided to you.

Revenue Sharing Payments: Escrow Agent may receive revenue sharing payments from a Money Market Fund Company. These payments represent a reallocation to Escrow Agent of a portion of the compensation payable to the fund company in connection with your account's money market fund investment. Revenue Sharing payments constitute a form of fee sharing between the fund company and Escrow Agent and do not, as a general rule, result in any additional charge or expense in connection with a money market fund investment, are not paid under a 12b-1 plan, and do not impact the investment performance of the Fund. The amount of any revenue share, if any, payable to Escrow Agent with respect to your account's investments is available upon request.

22

CHICAGO\2158486.1
ID\JIM

Forma

23

# APPENDIX H

## APPENDIX H

## COVENANT BENEFICIARY ELECTION FORM

The following entity, by its undersigned representative, elects to become a Covenant Beneficiary in the RD/RA Consent Decree entered into by the State of Illinois ("State") and Settling Defendants in the action filed in the United States District Court for the Northern District of Illinois, Western Division (the "Court") entitled <u>People of the State of Illinois v. BFI Waste Systems of North America, Inc., et al.</u>, Case. No. _____ (N.D. Ill.) ("RD/RA Consent Decree"):

Name: _____

Address: _____

_____

The undersigned hereby acknowledges that he/she has received a copy of the RD/RA Consent Decree, and that he/she has had opportunity to review it or seek legal advice regarding its terms, and in return for the rights, covenants and protections provided to Covenant Beneficiaries in the RD/RA Consent Decree agrees, on behalf of the Covenant Beneficiary, to the following:

1. The Covenant Beneficiary agrees, upon reasonable advance notice to the extent practicable based on the reason access is needed and site conditions, to provide the State and any Settling Defendant, and their contractors and representatives, access at all reasonable times to the portion(s) of the MIG/DeWane Landfill Site ("Site"), as defined in the RD/RA Consent Decree (and any other property in close proximity to the Site to which access is required for the implementation of the RD/RA Consent Decree), that it owns or controls to which access is necessary, as provided in Section IX of the RD/RA Consent Decree.

2. The Covenant Beneficiary covenants not to sue and agrees not to assert any claims or causes of action against the State with respect to the Work, Past Response Costs, or Future Response Costs (all as defined in the RD/RA Consent Decree), the RD/RA Consent Decree, or contributions of Settling Defendants or other Covenant Beneficiaries with respect to the RD/RA Consent Decree or other Covenant Beneficiary Election Forms, including, but not limited to:

   a. any direct or indirect claim for reimbursement from the Hazardous Substance Superfund (established pursuant to the Internal Revenue Code, 26 U.S.C. § 9507) through Sections 106(b)(2), 107, 111, 112, 113 of the Comprehensive Environmental Response, Compensation and Liability Act, as amended ("CERCLA"), 42 U.S.C. §§ 9606(b)(2), 9607, 9611, 9612, 9613, or any other provision of law;

   b. any claims against the State including any department, agency or instrumentality of the State under Section 107 or 113 of CERCLA, 42 U.S.C. §§ 9607 or 9613 related to the Site, or

      c.     any claims arising out of response activities at the Site, including claims based on U.S. EPA's and the State's selection of response actions, oversight of response activities or approval of plans for such activities.

     3.     The Covenant Beneficiary agrees, as provided in Paragraph 14 and 163 of the RD/RA Consent Decree, not to oppose entry of the RD/RA Consent Decree or to challenge the terms of the RD/RA Consent Decree or this Covenant Beneficiary Election Form and the Court's jurisdiction to enter and enforce the RD/RA Consent Decree and the Covenant Beneficiary Election Form. Failure of the Covenant Beneficiary to abide by this paragraph renders the rights, covenants and protections applicable to it under the RD/RA Consent Decree null and void.

     4.     The Covenant Beneficiary agrees not to sue the Settling Defendants or any other Covenant Beneficiary for matters addressed in the RD/RA Consent Decree, as defined in Paragraph 146 of the Partial RD/RA Consent Decree.

     5.     The Covenant Beneficiary does not admit any liability arising out of the transactions or occurrences alleged in the complaints or the RD/RA Consent Decree, nor does the Covenant Beneficiary acknowledge that a release or threatened release of hazardous substances at or from the Site constitutes an imminent or substantial endangerment to the public health or welfare or environment.

     6.     The undersigned representative of the Covenant Beneficiary named herein certifies that he/she is fully authorized to agree to the terms and conditions applicable to Covenant Beneficiaries herein and in the RD/RA Consent Decree and to execute and legally bind the Covenant Beneficiary to these terms and conditions. This form shall be filed with:

Gerald T. Karr
Assistant Attorney General
Environmental Bureau
188 West Randolph Street, 20th Floor
Chicago, Illinois 60601

and:

Paul Jagiello
Division of Legal Counsel
Illinois Environmental Protection Agency
9511 West Harrison Street
Des Plaines, Illinois 60016

copy to:

Gary D. Justis
Lathrop & Gage L.C.
10851 Mastin Blvd., Suite 1000
Overland Park, KS 66210

7.      This Covenant Beneficiary Election Form may be recorded with respect to any property owned or operated by a Covenant Beneficiary within the Site (as defined in the RD/RA Consent Decree).  If a Covenant Beneficiary owning or operating property at the Site records a copy of its Covenant Beneficiary Election Form with the Boone County Recorder of Deeds and provides a copy of the recordation to the State, with the effect that a subsequent purchaser, lessee, or mortgagee of the property is bound to comply with the Covenant Beneficiary Election Form, the benefits and responsibilities contained in the RD/RA Consent Decree with respect to Covenant Beneficiaries shall be binding upon and inure to the benefit of the subsequent purchaser, lessee, or mortgagee of the Covenant Beneficiary's property, but only to the extent that liability is sought to be imposed based upon the subsequent purchaser's, lessee's, or mortgagee's alleged ownership or operation of the Covenant Beneficiary's property and only so long as the subsequent purchaser, lessee, or mortgagee complies with all requirements or obligations of the Covenant Beneficiary pursuant to this the Covenant Beneficiary Form.

COVENANT BENEFICIARY:

By: _____
Title:_____

Attest (if applicable):

_____
BY: _____

If this Form is to be recorded by a Corporation:

STATE OF _____          )
                             )     SS
COUNTY OF _____      )

      I, the undersigned, a Notary Public, in and for the County and State aforesaid, DO HEREBY CERTIFY, that _____ personally known to me to be the _____ of said Corporation, and _____ personally known to me to be the _____ of said Corporation, and personally known to me to be the same persons whose names are subscribed in the foregoing instrument, appeared before me this day in person and severally acknowledged that as such _____ and _____ of said Corporation, and caused the corporation seal to be affixed thereto, pursuant to authority given by the Board of Directors of said corporation, as their free and voluntary act, and as the free and voluntary act of said corporation, for the purposes therein set forth.

      GIVEN under my hand and notarial seal this _____ day of _____, 20___.


                               _____
                                    NOTARY PUBLIC

My Commission Expires:

_____

PREPARED BY:

_____
_____
_____

RETURN TO:

_____
_____
_____

If this Form is to be recorded by an individual:

STATE OF _____ )
                         )     SS
COUNTY OF _____ )

      I, _____, a Notary in and for and residing in said County of _____, State of _____, DO HEREBY CERTIFY that _____ personally known to me to be the same person who name is subscribed to the foregoing instrument, appeared before me this _____ day of _____, 20___, and acknowledged that he/she signed, sealed and delivered said instrument as his/her free and voluntary act for the purposes therein set forth.

      GIVEN under my hand and notarial seal this ____ day of _____, 20___.

                                        _____
                                            NOTARY PUBLIC

# APPENDIX I

## USE RESTRICTION AGREEMENT

This Use Restriction Agreement is made and entered into by the LAE Defendants (as defined in Subparagraph 1.A. hereof), and the MIG/DeWane Landfill Task Force (the "MLTF") (as defined in Subparagraph 1.B. hereof), this ___**8 th**___ day of January, 1999.

WHEREAS, the LAE Defendants individually or collectively own certain property (the "Property"), located east of the City of Belvidere, in Boone County, Illinois, which Property and its ownership is shown on a map, attached hereto as Exhibit A, and which Property is legally described in Exhibit B attached hereto.

WHEREAS, landfill operations were conducted on a portion of the Property by a series of parties from approximately 1969 through 1988, and the landfill was placed upon the National Priorities List by the Environmental Protection Agency on August 30, 1990, as the "MIG/DeWane Landfill Site" (the "Site"). The Site and its legal description are shown in Exhibits A and B.

WHEREAS, an Administrative Order on Consent, together with all Attachments and Exhibits thereto (the "Order"), has been entered into among the MLTF, the United States Environmental Protection Agency ("the USEPA"), and the Illinois Environmental Protection Agency ("the IEPA"), pursuant to which a Remedial Investigation/Feasibility Study ("RI/FS"), has been conducted on the Site.

WHEREAS, the MLTF wishes to have appropriate use restrictions placed on the Site and a groundwater use restriction placed on portions of the Property beneficially owned by Audrey DeWane and Benjamin Farina, (hereafter, "Audrey and Ben"), to the south of the Site, in order to perform Site remedial activities pursuant to the current Order or a future administrative order or

1

consent decree among the MLTF, USEPA, and IEPA requiring the MLTF to perform response activities at the Site (the "Future Order").

WHEREAS, the LAE Defendants wish to assist in placing the appropriate use restrictions on the Site and a groundwater use restriction placed on portions of the Property beneficially owned by Audrey DeWane and Benjamin Farina to the south of the Site, to promote the completion of such activities.

WHEREAS, the parties have this day entered into a "Conditional Settlement Agreement" resolving their disputes concerning the Site and the parties' respective liabilities for response costs arising out of the Site, (hereafter "Conditional Settlement Agreement").

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, the parties agree as follows:

## 1. IDENTIFICATION OF PARTIES

A.     Whenever used herein, the term "LAE Defendants" means Raymond E. DeWane, Audrey DeWane, Benjamin Farina and Jean Farina, in whatever legal capacity, including, but not limited to, as individuals, as partners of the Bonus Landfill Company, or as beneficiaries of land trusts, and their respective heirs, beneficiaries, successors, assigns, agents, representatives and insurers; and, LAE, Inc., and Illinois corporation, its successors, assigns and insurers, and its present and former officers, shareholders, directors, employees, and representatives.

B.     Wherever used herein, the term MLTF means the MIG/DeWane Landfill Task Force, an unincorporated association, each individual member thereof, and their respective shareholders, officers, directors, employees, affiliates, subsidiaries, successors, and assigns, and

2

includes the MLTF for itself, and the individual members of the MLTF for themselves, and as successors in interest to, or assignees of the rights of, any other person or entity, whether pursuant to contract, by operation of law, or otherwise. The MLTF is comprised of the parties identified in the contemporaneously executed Conditional Settlement Agreement.

## 2. USE RESTRICTIONS ON THE SITE

If any portion of the Site, where land/water use restrictions are determined, by USEPA and IEPA, to be needed to promote the completion of response activities in the Order and/or Future Order, is owned or controlled by any of the LAE Defendants, those LAE Defendants shall, commencing on the date of execution of the USEPA/IEPA Settlement Agreement by the LAE Defendants, as provided in the Conditional Settlement Agreement, refrain from using the Site, (specifically including the land and water at or under the Site), in any manner that would knowingly interfere with or knowingly and adversely affect the integrity or protectiveness of the remedial measures to be implemented in the Order and/or Future Order. In addition to that general land/water restriction, if USEPA or IEPA determines in writing that Site-specific land/water restrictions, in the form of state or local laws, regulations, ordinances or other governmental controls, are needed to implement such remedial measures, ensure the integrity and protectiveness thereof, or ensure non-interference therewith, the LAE Defendants shall cooperate with USEPA's or IEPA's efforts to secure such governmental controls.

## 3. GROUNDWATER USE RESTRICTIONS ON PORTIONS OF THE AUDREY AND BEN PROPERTY

In consideration of a one-time payment by the MLTF to Audrey and Ben of the sum of five thousand dollars ($5,000.00), the receipt and sufficiency of which is mutually

3

acknowledged, Audrey and Ben shall, commencing on the execution date of this Agreement,

refrain from using the groundwater on that portion of the Property beneficially owned by them to

the south of the Site, located in the area of the Groundwater Management Zone ("GMZ"),

identified on the map attached hereto as exhibit D, until this Agreement is terminated.

### 4. EASEMENTS/DESCRIPTIONS

If USEPA or IEPA so requests in writing, the LAE Defendants shall execute and allow

the recording, in the Recorder of Deeds Office for Boone County, Illinois, of an easement to run

with title to the land, that grants the right to enforce, to the same extent that the MLTF could

enforce, the land/water use restrictions described in this Agreement, or other Site-specific

restrictions that USEPA or IEPA determines are necessary to implement, ensure non-interference

with, or ensure the protectiveness of the remedial measures to be performed as part of the Order

and/or Future Order. No such easement shall grant or be construed to grant a fee simple interest

in the affected Property to the grantee(s). Prior to the tendering of any easement to Audrey and

Ben, but in no event later than two years after execution of this Agreement, the MLTF will

obtain and provide to Audrey and Ben, at the MLTF's expense, a legal description of the extent

of the GMZ on the portions of the Property beneficially owned by Audrey and Ben to the south

of the Site. The LAE Defendants shall grant the rights to enforce the land/water use restrictions

to (i) the United States, on behalf of USEPA, and its representatives; (ii) the State of Illinois, on

behalf of IEPA, and its representatives; and/or (iii) other appropriate parties identified by USEPA

or IEPA. Any easement granted hereunder shall be conditioned upon the written agreement of

the grantee(s) to provide, and pay for the recording of, written vacation of such easement not

later than one month after a use restriction described within such easement terminates.

4

## 5.  TERMINATION OF USE RESTRICTIONS

This Agreement and all Amendments hereto shall be construed as covenants running with the land.  This Agreement shall terminate, with respect to each use restriction hereunder, at the time the requirement for that use restriction terminates under the Order or under a Future Order.  Further, the MLTF may terminate this Agreement, in whole or in part, whenever they determine, and provide written notice to the LAE Defendants, that it is no longer necessary.  In the event a use restriction terminates, the MLTF shall, at its expense, execute and record, if recordation is necessary to clear title, an appropriate document evidencing the fact of that termination.

## 6.  NO WAIVER; ENTIRE AGREEMENT

The failure of the MLTF or the LAE Defendants to insist upon the strict performance of any terms, covenants, or conditions of this Agreement, or to exercise any right or remedy herein contained, shall not be construed as a waiver or relinquishment for the future of such term, covenant, condition, right or remedy.  This Agreement and the attached Exhibits constitute the entire Agreement between the LAE Defendants and the MLTF with respect to use restrictions on the LAE Defendants' Property.

## 7.  CONSTRUCTION

It is mutually agreed that this Agreement shall be construed and interpreted as if drafted by each party and it is further acknowledged that this Agreement is the product of negotiations between the parties, and shall not be construed or interpreted against either party based on such party having drafted this Agreement, or any portion thereof.

## 8.  INVALIDITY

5

A determination by a Court of competent jurisdiction that any provision of this Agreement is invalid for any reason shall not affect the validity of any other provision.

## 9. AGENTS AND EMPLOYEES OF THE MLTF

The rights granted to the MLTF and their successors and assigns under this Agreement may be exercised through their respective agents, employees, and contractors and by representatives of USEPA and IEPA, including their respective employees, agents, and contractors.

## 10. HEADINGS

The headings of this Agreement are for convenience only and shall not affect the meaning or construction of the contents of this Agreement.

IN WITNESS WHEREOF, this Agreement has been executed the day and year first above written.

MIG/DeWane Landfill Task Force

By: _Carolyn D Hesse_

Its: _Chairperson_

LAE Defendants

LAE, Inc.

By: _Raymond E. DeWane_

Its: _President_

_Raymond E. DeWane_
Raymond E. DeWane

_Audrey DeWane_
Audrey DeWane

_Benjamin Farina_
Benjamin Farina

_Jean Farina_
Jean Farina

Subscribed and Sworn to before
me this 28th day of Dec., 1998

_Joanne R. Appelquist_
Notary Public

```
"OFFICIAL SEAL"
JOANNE R. APPELQUIST
Notary Public, State of Illinois
My Commission Expires 4-20-2002
```

M:\LAE\00077\SET DOC\userstrict\agreement.wpd

7



THE SITE
(CROSS-HATCHED)

N

SOUTHERN BOUNDARY
OF GROUNDWATER
MANAGEMENT
ZONE

L.A.E. INC.
PROPERTY CODE 06-06-30-400-006
42.60 ACRES

L.A.E. INC.
PROPERTY CODE 06-...-...
42 ACRES

TOE OF SLOPE

APPROXIMATE CENTERLINE OF COMMONWEALTH
EDISON AND PIC UTILITIES EASEMENT

30' WIDE EASEMENT TO THG, INC. FOR
THE INGRESS AND EGRESS OF VEHICULAR
AND PEDESTRIAN TRAFFIC

AUDREY & BEN
PROPERTY
(SINGLE LINE)

FIRST NATIONAL BANK + TRUST OF ROCKFORD.
TRUST #6682
PROPERTY CODE 06-06-31-200-024
6.04 ACRES

C

J

B

J

H

USE RESTRICTION AGREEMENT

EXHIBIT A

PROPERTY = AUDREY & BEN PROPERTY
AND THE SITE

## EXHIBIT B - THE PROPERTY

<u>General</u>.      The Property consists of the Site and the Audrey and Ben Property.

## THE AUDREY AND BEN PROPERTY

Owner:      Bank One, Illinois, NA, as Trustee under Trust No. 6682, the beneficiaries of which are Audrey DeWane and Benjamin Farina

Property Code of Parcel:      06-06-31-200-024 (@46.04A)

Description:  **Parcel 06-06-31-200-024**

Part of the Northeast Quarter (¼) of Section Thirty-one (31), Township Forty-four (44) North, Range Four (4) East of the Third (3rd) Principal Meridian, bounded and described as follows, to-wit: Commencing at the Northwest corner of the Northeast Quarter of said Section; thence South, along the West line of the Northeast Quarter of said Section, 350.73 feet <u>to the point of beginning for the following described parcel</u>; thence East, parallel with the North line of the Northeast Quarter of said Section, 2214.0 feet, more or less, to the Easterly line of premises conveyed by Elizabeth Crawford to John E. DeWane and Agnes M. DeWane by Warranty Deed dated March 1, 1950 and recorded in Book 104 of Deeds on page 106 in the Recorder's Office of Boone County, Illinois; thence Southwesterly, along said Easterly line, 1209.0 feet, more or less, to its intersection with a line which is 600.0 feet perpendicularly distant Northeasterly from and parallel with the centerline of State Street Road (U.S. 20) running Northwesterly and Southeasterly through said Quarter Section; thence Northwesterly, parallel with the centerline of said State Street Road, 1997.0 feet, more or less, to the West line of the Northeast Quarter of said Section; thence North, along the West line of the Northeast Quarter of said Section, 690.0 feet, more or less, to the point of beginning.

## THE SITE

Owner:      LAE, Inc., an Illinois corporation.

Property Codes of Parcels:      06-06-30-400-005 (@ 2.95A)
06-06-30-400-006 (@42.60A)
06-06-31-200-023 (@17.42A)

Description:   **Parcel 06-06-30-400-005**

That part of the South Half of Section 30, Township 44 North, Range 4 East of the Third Principal Meridian, bounded and described as follows: Beginning at the Southeast corner of said Section; running thence Westerly along the South line of said Section, 329 feet; thence North 178 feet; thence Northwesterly parallel with right of way of Chicago and Northwestern Railroad Company, 142 feet; thence Northeasterly at right angles with said right of way, 25 feet; thence Westerly parallel with said right of way, 2452 feet; thence North 50 feet to Chicago and Northwestern Railroad Company's right of way; thence Easterly along said right of way to East line of said Section; thence South to beginning; (excepting therefrom a parcel of land bounded and described as follows: Beginning at the Southeast corner of said Section; running thence Westerly along the South line of said Section, 329 feet; thence North to the South right of way line of the Chicago and Northwestern Railroad Company; thence Easterly along said right of way line to the East line of said Section; thence South to the place of beginning), all situated in County of Boone, State of Illinois.

**Parcels 06-06-30-400-006 and 06-06-31-200-023**

Part of the Southeast Quarter (¼) of Section Thirty (30), Township Forty-four (44) North, Range Four (4) East of the Third (3rd) Principal Meridian and part of the Northeast Quarter (¼) of Section Thirty-one (31), Township Forty-four (44) North, Range Four (4) East of the Third (3rd) Principal Meridian, bounded and described as follows, to-wit: Beginning at the Southwest corner of the Southeast Quarter of said Section 30; thence North, along the West line of the Southeast quarter of said Section 30, a distance of 1136.0 feet, more or less, to its intersection with the Southerly line of premises conveyed by Elizabeth Crawford to the Elgin and Belvidere Electric Company by Warranty Deed dated May 4, 1906 and recorded in Book 63 of Deeds on page 544 in the Recorder's Office of Boone County, Illinois; thence Southeasterly, along the Southerly line of said premises so conveyed by Crawford to Elgin And Belvidere Electric Company as aforesaid, 401.0 feet, more or less to a point of curve; thence Southeasterly, along the Southerly line of said premises so conveyed by Crawford to the Elgin and Belvidere Electric Company as aforesaid and along a circular curve to the right having a radius of 2667.0 feet and whose center lies to the Southwest, an arc distance of 955.0 feet, more or less, to a point of tangency; thence continuing Southeasterly, along the Southerly line of said premises so conveyed by Crawford to Elgin and Belvidere Electric Company as aforesaid, 776.0 feet, more or less; thence South, parallel with the East line of the Southeast Quarter of said Section, 497.53 feet; thence East, parallel with the South line of the Southeast Quarter of

EXHIBIT B TO USE
RESTRICTION AGREEMENT

said Section, 312.0 feet to the Easterly line of premises conveyed by Elizabeth
Crawford to John E. DeWane and Agnes M. DeWane by Warranty Deed dated
March 1, 1950 and recorded in Book 104 of Deeds on page 106 in said Recorder's
Office; thence Southwesterly, along the Easterly line of said premises so
conveyed by Crawford to DeWane as aforesaid, 261.0 feet, more or less, to its
intersection with a line which is 350.73 feet perpendicularly distant South of and
parallel with the North line of the Northeast Quarter of said Section 31; thence
West, parallel with the North line of the Northeast Quarter of said Section 31, a
distance of 2214.0 feet, more or less, to the West line of the Northeast Quarter of
said Section 31; thence North, along the West line of the Northeast Quarter of said
Section 31, a distance of 350.73 feet, more or less, to the place of beginning.
Situated in the County of Boone and the State of Illinois.

**EXHIBIT C**
**TO**
**CONDITIONAL SETTLEMENT AGREEMENT**

**ACCESS AGREEMENT**

This Access Agreement is made and entered into this ~~8th~~ day of ~~December, 1998~~ January 1999 by

and between LAE, Inc., Raymond DeWane, Jean Farina, Audrey DeWane and Benjamin Farina,

("Grantors") and the MIG/DeWANE LANDFILL TASK FORCE (as defined in the attached

Settlement Agreement) ("Grantees") under the following circumstances:

WHEREAS, Grantors are the owners of certain property (the "Property"), located east of

the City of Belvidere, in Boone County, Illinois, which Property and its ownership is shown on a

map, attached hereto as Exhibit A, and which Property is legally described in Exhibit B attached

hereto.

WHEREAS, landfill operations were conducted on a portion of the Property by a series of

parties from approximately 1969 through 1988, and the landfill was placed upon the National

Priorities List by the Environmental Protection Agency on August 30, 1990, as the

"MIG/DeWane Landfill Site" (the "Site"). The Site and its legal description are shown in

Exhibits A and B.

WHEREAS, an Administrative Order on Consent, together with all Attachments and

Exhibits thereto, (the "Order") has been entered into among the Grantees, the United States

1

Environmental Protection Agency ("USEPA") and the Illinois Environmental Protection Agency ("IEPA"), pursuant to which a Remedial Investigation/Feasibility Study ("RI/FS"), has been conducted on the Site;

WHEREAS, the Grantees wish to have continued access to the Site in order to perform Site remedial activities pursuant to the current Order or a future administrative order or consent decree among Grantees, USEPA and IEPA requiring Grantees to perform response activities at the Site (the "Future Order"). Grantors wish to continue to permit access to the Property, including the Site, to promote the completion of such activities.

NOW, THEREFORE, in consideration of the foregoing and for other good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged, the parties agree as follows:

## 1.     GRANT OF ACCESS TO SITE

A.     Grantors hereby grant to Grantees, USEPA, and IEPA, and each of their respective agents, consultants, employees and contractors, the nonexclusive right to use any driveways and roadways existing at the Site, or at the Property for purposes of access, ingress and egress to, from and between the Site and the streets and highways abutting and adjacent to the Property , without any fee or other charge being made for such use.

B.     Grantors grant to Grantees, USEPA and IEPA, each of their respective agents, consultants, employees and contractors, the right, at their expense, (and without recourse to

2

Grantors), to construct and maintain such other roadways on the Site deemed appropriate or necessary by Grantees, USEPA or IEPA to perform the remedial design, remedial action, oversight and related activities with respect to the Site.

C.       The parties further recognize that this Access Agreement does not constitute an admission by Grantors of liability for any conditions at the MIG/DeWane Landfill Site, nor shall it be considered a release of liability, if any, for Site conditions.

D.       Grantees shall construct and/or maintain all driveways and roadways in that condition and state of repair necessary for the uses to which such will be put by Grantees and their contractors and invitees. Further, Grantees shall not cause or allow any driveways or roadways on the Property to be in such a state of use, traffic or disrepair as to cause or contribute to a hazard to lawful users of such driveways or roadways.

E.       The grant of access here given is restricted to such uses of existing driveways and roadways as are reasonable and necessary to the performance by Grantees of obligations set forth in the Order and/or Future Order. Grantees are responsible for assuring that vehicles, material and equipment using or being transported on driveways and roadways are designed, equipped and operated in a safe and lawful manner. Grantees will endeavor not to use driveways and roadways before the hour of 6:00 a.m. (CST) or after the hour of 7:00 p.m. , but have the right to use such ways during any reasonable hours.

## 2.   SITE UTILIZATION

A.       Grantees, USEPA, and IEPA shall have the right to enter on the Site, at reasonable

3

times and in a reasonable manner, and take any action which is reasonably necessary to carry out remedial design, remedial action, oversight, and related activities, in, under or around the Site, as described in the Order or a Future Order.

   B.     The parties recognize that the performance of remedial design, remedial action, oversight, and related activities are within the sole and absolute control of Grantees, USEPA or IEPA. Grantors cannot, and will not attempt to, direct the manner in which such activities shall be performed.

   C.     Grantees, USEPA, and IEPA shall have the right to erect any fencing on the Site deemed necessary or appropriate for security or the performance of the remedy and related activities.

   D.     Grantors will not interfere with any remediation facilities or operations occurring at the Site or interfere with any other operation or activities of Grantees, USEPA, or IEPA pursuant to their rights under this Agreement. Provided, however, Grantors reserve their rights to take legal action to enjoin any breach of this Agreement, and any activities of Grantees, USEPA, IEPA, or their respective agents, consultants, employees and contractors, which constitute a public or private nuisance, trespass or violation of law.

   E.     Grantees agree that they will not make any change in the Site for any purpose not necessary or appropriate to carry out remedial design, remedial action, oversight, or related activities with respect to the Site. The grant to utilize the Site is not, and shall not be construed as, a grant or license to create a condition which is not allowed by federal, state or local law.

4

### 3.  TERMINATION

A.     This Agreement and all Amendments hereto shall be construed as covenants running with the land.  This Agreement shall terminate at the time Grantees' obligations terminate under the Order or under a Future Order.  Further, Grantees may terminate this Agreement whenever they determine, and provide written notice to Grantors, that it is no longer necessary to enter on Grantors' Property, in which event Grantees shall, at their expense, execute and record an appropriate document evidencing the fact that this Agreement has terminated. Further, the failure of Grantees to obtain the additional named insured status for Grantors under the policies described at  Paragraphs 9 (b) and (c) shall operate to terminate this Agreement.

B.     Upon termination of this Agreement, Grantees shall surrender all fixtures which Grantees have permanently attached to the Property, except such fixtures as Grantees shall direct Grantors to remove.  Upon termination, Grantees shall remove from the Property all non-fixtures which were placed upon the Property during the term of this Access Agreement or the term of preceding access agreements.

### 4.  NO WAIVER; ENTIRE AGREEMENT

The failure of Grantees or Grantors to insist upon the strict performance of any terms, covenants, or conditions of this Agreement, or to exercise any right or remedy herein contained, shall not be construed as a waiver or relinquishment for the future of such term, covenant, condition, right or remedy.  This Agreement and the attached Exhibits constitute the entire Agreement between Grantors and Grantees with respect to access to Grantors' Property.

5

## 5.  CONSTRUCTION

It is mutually agreed that this Agreement shall be construed and interpreted as if drafted by each party and it is further acknowledged that this Agreement is the product of negotiations between the parties, and shall not be construed or interpreted against either party based on such party having drafted this Agreement, or any portion thereof.

## 6.  INVALIDITY

A determination by a Court of competent jurisdiction that any provision of this Agreement is invalid for any reason shall not affect the validity of any other provision.

## 7.  AGENTS AND EMPLOYEES OF GRANTEES

The rights granted to Grantees and their successors and assigns under this Agreement may be exercised through their respective agents, employees, and contractors and by representatives of USEPA and IEPA, including their respective employees, agents, and contractors.

## 8.  HEADINGS

The headings of this Agreement are for convenience only and shall not affect the meaning or construction of the contents of this Agreement.

## 9.  INDEMNIFICATION; INSURANCE AND REPAIRS

(a)     The Grantees, jointly and severally, shall defend, indemnify and hold harmless Grantors, and their successors, heirs or assigns, from and against all claims, losses,

6

administrative or judicial proceedings, damages, and all costs and expenses incidental thereto, (including reasonable attorneys' fees), arising out of the use or occupancy of, operations conducted upon or equipment or materials placed or installed upon the Property by Grantees, USEPA or IEPA, or their agents, contractors, employees or invitees. In the event Grantees do not meet their obligation to defend Grantors, because of an actual or potential conflict of interest between Grantees and Grantors, Grantees' obligation to defend shall be met by timely paying the reasonable defense costs (including attorneys' fees) of the Grantors. The obligations of this subparagraph shall survive termination of this Agreement.

(b)     If Grantees procure, at any time during the term of this Agreement, insurance contracts covering the liability of Grantees for bodily injury, property damage and personal injury actually or allegedly sustained by any third party and arising out of the uses, operations or equipment described in the preceding subparagraph (a), Grantees shall cause each of the Grantors to be a named additional insured under each such insurance contract by written endorsements thereto. Within five days following the inception date of each such policy, Grantees shall provide written notice to Grantors, identifying the specific policy obtained and stating that Grantors have been named as additional insureds by a specific written endorsement. Such notice shall also provide Grantors with a certificate of such insurance, executed by an agent or the insurer, and a copy of the endorsement by which Grantors were named as additional insureds.

(c)     Grantees shall ensure that Grantors are named as additional named insureds, by policy endorsement, on the liability insurance policies of each contractor retained by Grantees to

7

do any work on the Property. If Grantees are named insureds on the liability insurance policies of any subcontractors of such contractors, Grantees shall ensure that such additional insured status is also extended to Grantors. It shall be the responsibility of Grantees to obtain, and promptly deliver to Grantors, certificates of insurance for each policy on which Grantors are named additional insureds and a copy of each policy endorsement by which the Grantors are provided additional insured status.

     (d)     Grantees shall ensure that the liability insurance policies, including workers' compensation policies, of each contractor retained by Grantees to do any work on the Property, provide a waiver of the insurer's rights of subrogation against each of the Grantors.

     (e)     The Grantees agree to repair, promptly, any damage to the Property arising of acts or omissions of Grantees, USEPA, IEPA, and their agents, contractors, consultants, employees or invitees, while on the Property.

     10.     <u>RELEASE OF LIABILITY AND COVENANT NOT TO SUE</u>

     The Grantees, jointly and severally, release Grantors from, and covenant not to sue Grantors for, liability to Grantees, including liability by way of contribution, indemnification, assignment or subrogation, for personal injury, bodily injury or property damage arising out of the use or occupancy of, or operations upon, the Property by Grantees, their agents, contractors, consultants, employees or invitees.

8

**IN WITNESS WHEREOF**, this Agreement has been executed the day and year first above written.

**MIG/DeWane Landfill Task Force**

By: *Carolyn Strosse*

Its: *Chairperson*

**LAE Defendants**

LAE, Inc.

By: *Raymond E. DeWane*

Its: *President*

*Raymond E. DeWane*
Raymond E. DeWane

*Audrey DeWane*
Audrey DeWane

*Benjamin Farina*
Benjamin Farina

*Jean Farina*
Jean Farina

Subscribed and Sworn to
before me this 28th day
of January, 1999.

*Joanne R. Appelquist*
Notary Public

"OFFICIAL SEAL"
JOANNE R. APPELQUIST
Notary Public, State of Illinois
My Commission Expires 4-20-2002

# APPENDIX J

## APPENDIX J

## STATE ENTITIES EXCLUDED FROM COVENANTS NOT TO SUE

H. Douglas Singer Mental Health Center, Rockford, Illinois